**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MINNESOTA
MINNEAPOLIS DIVISION**

| | | |
|---|---|---|
| JOSH JAMESON and TAWNEY JAMESON, individually and on behalf of L.J., a minor, | ) ) ) | |
| Plaintiffs, | ) ) | <u>Case No.: 24-cv-1602-JMB-TNL</u> |
| v. | ) ) | **Judge Jeffrey M. Bryan** |
| ROBLOX CORPORATION; APPLE, INC.; MOJANG AB; MICROSOFT CORPORATION; and JANE & JOHN DOE III-XX, | ) ) ) ) | |
| Defendants. | ) ) | |

**AMENDED AND SUPPLEMENTAL COMPLAINT
<u>AND DEMAND FOR JURY TRIAL</u>**

Plaintiffs Josh Jameson and Tawney Jameson, individually and on behalf of L.J., a minor, hereby bring this action for personal injuries against the Defendants Roblox Corporation, Apple, Inc., Mojang AB, Microsoft Corporation, and Jane & John Doe III-XX (hereinafter collectively "**DEFENDANTS**") to recover damages sustained by each Plaintiff because of **DEFENDANTS**' defective and dangerous video gaming products, and file this *Amended and Supplemental Complaint and Demand for Jury Trial* notifying each Defendant of Plaintiffs' claims for relief pursuant to and as available under Minnesota law. In support thereof, Plaintiffs allege and state:

## INTRODUCTION

1.      This action seeks to hold **DEFENDANTS** accountable for causing and contributing to a health crisis, nothing short of a global epidemic, of minors suffering from an addiction[1] or disordered compulsion to using the **DEFENDANTS**' addictive and unreasonably dangerous gateway video gaming products.

2.      Each **DEFENDANT** designed, developed, marketed, manufactured, sold, failed to warn about, failed to instruct about, distributed, tested, patented, licensed, assembled, packaged, labeled, prepared, supplied and/or otherwise provided accessibility for consumers to use video gaming products (hereinafter generally referred to as "placing into the stream of commerce").

3.      The video gaming products used by L.J. at issue here are: Roblox and Minecraft, along with the devices, mechanisms, and systems through which those products are used (iPad and iPhone via the App Store and/or personal computer via Xbox Network) inclusive of each product's patent-protected technologies of addictive design features and the mechanisms systems, and/or devices through which minors use, access, and consume these products (hereinafter collectively referred to as "Products").

4.      These Products are marketed as and serve as "gateway" video gaming

---

[1] Addiction involves six core components: (1) Salience—the activity dominates thinking and behavior; (2) Mood modification—the activity modifies/improves mood; (3) Tolerance—increasing amounts of the activity are required to achieve previous effects; (4) Withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) Conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) Relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

products for minors in that they serve to introduce minors to video gaming and the addictive mechanisms found within **DEFENDANTS**' Products.

5. The addiction and/or disordered compulsion to using the Products is a profound harm that triggers an extraordinary sequela of catastrophic and life-altering injuries to the user and their families.

6. The Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to cause users, specifically minors, to become psychologically addicted to using, or to develop a disordered compulsion to using, video game products.

7. **DEFENDANTS** failed to provide any warning to users or their caregivers of the harm posed by using the Products, resulting in extraordinary detriment to users and their caregivers, including Plaintiffs herein.

8. The harm manifests in physical, emotional, mental, and financial damage to users and their families, and such harm was experienced by Plaintiffs as a result of L.J.'s use of **DEFENDANTS'** Products.

9. The defective and unreasonable dangerous nature of the Products extraordinarily benefits **DEFENDANTS** financially; to wit, **DEFENDANTS** have implemented in-game monetization schemes, particularly microtransactions, which are fueled by operant conditioning and other methodologies designed to target users' dopamine receptors; **DEFENDANTS'** design microtransactions and other in-game monetization systems are designed to take advantage of users, particularly minors, dopamine receptors and still developing brain, and the Products' design incorporates and

utilizes operant conditioning, artificial intelligence, and other methodologies intended to trigger the user's desire to hyperfocus on using the Products more frequently and extensively, thereby spending increasing amounts of real money within the Products; and **DEFENDANTS'** defective Products are intended to and do cause compulsive, addictive use of the products and the in-game microtransactions work in tandem with those addictive design features to generate real money for the **DEFENDANTS**.

10.     **DEFENDANTS'** actions and deception arise from quintessential corporate greed, resulting from a conscious and deliberate decision borne from engaging in ruthless cost-benefit analysis, such that **DEFENDANTS** placed profits over the health and well-being of consumers, including minors, to whom they aggressively market their defective Products.

11.     **DEFENDANTS**' decision has resulted in a considerable and growing population of minors who have developed an addiction or disordered need to use **DEFENDANTS**' Products, to the extreme detriment of their still-developing brains.

12.     As of 2022, video game addiction or "gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[2] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of

---

[2] Other disorders found in that subcategory include alcoholism and gambling addiction.

persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

13.    Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[3] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include:  (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to

---

[3] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

playing and/or using video games.

14.    The rapid spread of video game addiction was and is proximately caused by the **DEFENDANTS**' concerted effort to get consumers, and particularly minors, addicted to using the **DEFENDANTS**' Products in order to maximize **DEFENDANTS**' profits.

15.    **DEFENDANTS** placed into the stream of commerce certain Products that were intentionally designed to be as addictive as possible to those who use them, particularly to minors. **DEFENDANTS** did so despite having actual and/or constructive knowledge of the risk of harm their Products posed to users and their families, because of the addictive design features.

16.    L.J., and children similarly situated, did not start using the Products here at issue with any knowledge or reason to think they could ever develop an addiction or disordered compulsion to using them. Nor, of course, did Josh Jameson or Tawney Jameson, or other parents similarly situated, have any such knowledge or reason to think the same.

17.    The **DEFENDANTS** acted with the intention to cause minors who used their Products, including L.J., to develop such an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use could occur. **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence, dark patterns, and patented systems, to cause the user to develop an addiction or disordered compulsion to use them.

18.    The **DEFENDANTS**' intent was realized: L.J. developed an addiction and disordered compulsion to use **DEFENDANTS'** Products and, as a result, the

**DEFENDANTS** generated profits from their wrongful and tortious actions.

## NATURE OF THE ACTION

19.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

20.    This action seeks to hold the **DEFENDANTS** accountable for causing and contributing to the global epidemic of minors suffering from an addiction or disordered compulsion to use the **DEFENDANTS**' Products by placing into the stream of commerce Products which were defective and unreasonably dangerous in that they were designed and intended to cause users, specifically minors, to develop an addiction or disordered compulsion to using them.

21.    Plaintiffs' injuries and damages, as described herein, are legally and proximately caused by the **DEFENDANTS**' participation in placing their defective, unreasonably dangerous Products into the stream of commerce, include but are not limited to: (a) L.J.'s video gaming addiction; compulsive and disordered use of **DEFENDANTS'** Products; brain damage; loss of cognitive function and delayed executive development; severe emotional distress; diminished social interactions outside of gaming interactions; loss of friends; fatigue; impulse issues that cause problems in relationships; depression; anxiety; adjustment disorder; suicidal ideation; cutting; poor hygiene; dishonest behavior including lying, hiding game play and product usage, and stealing money to purchase virtual currency for use in Roblox and/or Minecraft; and withdrawal symptoms including gamer's rage, anger, and physical outbursts and harm to others and oneself; and (b) Josh Jameson and Tawney Jameson's mental anguish, emotional distress, and financial losses.

22.     The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors many of whom, like L.J., began playing as young children and either have developed an addiction or disordered desire to using the Products or are at severe risk of developing that injury. Their addiction is like any other; it consumes the life of an addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the person will engage in self-harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

23.     This action arises from the **DEFENDANTS**' brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to the user. The **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the Products to be designed with addictive qualities and features with the intention of causing users to want to use the Products more and more.

24.     This is an action for personal injuries rooted, in part, in strict product liability based upon defective design, failure to warn, and failure to instruct. The design defects of the Products were present in the products when they left the hands of the **DEFENDANTS**, were not reasonably safe for ordinary consumers to use, and were particularly unsafe for minors, because they contained addictive features intended to cause the user to want and then need to use the products more and more, until the user develops an addiction or disordered compulsion to use the products. The warning defects of the Products is reflected in the complete absence of any warnings directed to minor users and/or their caregivers

-8-

regarding the risk of severe harm from using the products in a reasonably foreseeable manner, including severe physical, mental, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiffs herein. There is no warning to anyone about the risks described herein that are posed by the **DEFENDANTS'** Products. Nor are there any instructions on how to safely use **DEFENDANTS'** Products to avoid the risks and harms described herein.

25.    The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of one's body. Dopamine serves as the brain's all-important "reward center" and plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minor children and particularly true in neurodivergent minor children, whose brains are still developing.

26.    The repetitive release of dopamine that was designed to and does occur in users (especially minor children) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus

on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the products is addictive or disordered. Dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world that cause life-altering impulsivity and inhibitory control behaviors that result in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the user; where, as here, the user is a minor child, the user's caretakers / family suffer severe emotional detriment and pecuniary damage.

27.     **DEFENDANTS** design their Products to be addictive by incorporating and utilizing traditional game theory tactics, operant conditioning (e.g., dark patterns, skinner boxes, feedback loops, rubber-banding), artificial intelligence, and reward systems, along with patented designs containing addictive features, systems, mechanisms, and shared technology, in their video gaming product designs to ensure consumers continue to use and engage in "microtransaction" spending within the **DEFENDANTS**' Products.

28.     **DEFENDANTS** rely on microtransactions to increase their profits from their Products. "Microtransactions" are not random, but are the result of **DEFENDANTS**' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into **DEFENDANTS**' Products. By designing their Products to be addictive, **DEFENDANTS** ensure that users, like L.J., will be exposed to and subjected to **DEFENDANTS**' deceptive conduct and harmful

"microtransactions."

29.    The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors, many of whom like L.J. began playing as young children, who either have developed an addiction or disordered desire to using the products or at severe risk of developing that harm. Their addiction is like any other addiction that consumes the life of an addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the individual will engage in addictive, abusive, and self-harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

30.    This is an action for personal injuries rooted, in part, in negligence arising from the **DEFENDANTS'** participation in placing their defective, unreasonable dangerous Products into the stream of commerce and into the hands of Plaintiffs herein, products that included no warning of the dangers associated with their use for their intended purpose and as reasonably foreseeable, risks for which the **DEFENDANTS** had a duty to disclose to the consuming public but which they did not disclose, and which resulted in causing serious injuries to Plaintiffs. The **DEFENDANTS** knew, or in the exercise of ordinary care should have known, that their products would be harmful to a significant percentage of minor children who used them because those products were intentionally designed to incorporate and employ addictive design features. The **DEFENDANTS**, despite that actual or constructive knowledge, failed to (by choosing to not) redesign their products to ameliorate the potential harms posed by the products, and failed to warn users or the parents of users

who are minor children of the risks posed by the products.

31.    This is an action for personal injuries rooted, in part, in common law negligence, including negligence *per se*, arising from the **DEFENDANTS'** breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minor children. The **DEFENDANTS** either knew or should have foreseen the likelihood of risk of harm posed by the dangers of using their products and the breach of their duty to disclose or warn of those dangers caused severe harm to the Plaintiffs herein.

32.    This is an action for personal injuries rooted, in part, in the tort of intentional infliction of emotional distress arising from the **DEFENDANTS'** outrageous and extreme misconduct in designing their Products to be addictive and, therefore, cause mental distress to users who become addicted to or develop a compulsive disorder to using **DEFENDANTS'** Products.

33.    This is an action for personal injuries rooted, in part, in the intentional tort of deceit, including fraudulent misrepresentation, fraudulent omission and nondisclosure, and fraudulent concealment, as well as the tort of negligent misrepresentation. The **DEFENDANTS** made materials omissions of fact designed to lull potential users of their products, and caregivers of potential minor users, to have no concern in using their products and to trust that they were safe to use when done so in a reasonably foreseeable manner. The **DEFENDANTS** placed user safety below their own profits. The **DEFENDANTS** made untrue expressions of fact or suggestion of fact which Plaintiffs and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and

had no reasonable ground for believing to be true. The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their products they knew or should have known to be true and which they had a duty to disclose to Plaintiffs, and those similarly situated as Plaintiffs. The **DEFENDANTS** expressly and impliedly represented to members of the general public, including purchasers and users of the products, including Plaintiffs herein, that their products were of merchantable quality and safe for foreseeable use. Plaintiffs relied upon those representations in purchasing the products and allowing their minor children to use those products, when all the while the **DEFENDANTS** knew that their representations and expressions of product safety were untrue.

34.     This is an action for personal injuries rooted, in part, in the torts of civil conspiracy and acting in concert arising from the **DEFENDANTS**' knowledge that the other **DEFENDANTS**, and each of them, did commit or were committing the wrongful tortious acts alleged herein, agreed to and did commit the wrongful tortious acts alleged herein in concert with one another and/or pursuant to a common design, gave substantial assistance and encouragement to one another to engage in such conduct which, separately considered, constituted a breach of duty to the Plaintiffs. The **DEFENDANTS**, in pursuing a common plan or design to commit the tortious acts as alleged herein, and in actively participating in the tortious acts, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS**' acts done for their collective benefit, and as such each of the **DEFENDANTS** is equally liable for each of the other **DEFENDANTS**' tortious acts or failures to act.

35.    **DEFENDANTS**' defective products and tortious conduct were the actual and proximate cause in the injuries and damages Plaintiffs sustained.

36.    The video game addiction, or gaming disorder, and injuries caused by using **DEFENDANTS**' Products impacts thousands of product users and their families across the United States, including in Minnesota.

37.    Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of **DEFENDANTS**' Products. Plaintiffs have been injured and harmed as a proximate result of **DEFENDANTS**' actions and misconduct; for that they are entitled to compensation and other damages under Minnesota law; to wit, **DEFENDANTS**' defective products and tortious conduct, as herein alleged, were the actual and proximate cause in the injuries and damages Plaintiffs sustained.

38.    **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused damage to L.J.'s emotional and cognitive development, and proximately caused L.J.'s video game addiction and the sequalae of symptoms, injuries, and harm associated therewith including major adjustment disorder, depression, suicidal ideation, an inability to control impulsive behavior, compulsive and disordered use of **DEFENDANTS'** Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, loss of friends, fatigue, impulse issues that cause problems in relationships, poor hygiene, dishonest behavior including lying, hiding game play and product usage, and stealing money to purchase virtual currency for use in Roblox and/or Minecraft. As a result of the

addiction caused by L.J.'s use of **DEFENDANTS**' Products, L.J. experiences withdrawal symptoms such as rage, anger, and physical outbursts towards themself and others if those video gaming products are restricted or taken away. As a result of the gaming addiction and harm proximately caused by **DEFENDANTS**' misconduct, L.J. requires outpatient mental health counseling and medication, along with abstinence from video gaming and using **DEFENDANTS'** Products under the supervision of a medical care provider to control L.J.'s video game addiction and the sequalae of symptoms associated therewith. L.J. also experiences learning problems and difficulties in school, has been diagnosed with a learning disability due to inability to organize and prioritize schoolwork, and is on an individualized education plan at school, because of the video game addiction, brain injury, and cognitive harm proximately caused by **DEFENDANTS'** Products.

39.     As a result of L.J.'s use of **DEFENDANTS**' defective Products, Josh Jameson and Tawney Jameson's child has become addicted to playing video games and he has personally witnessed, but been unable to protect their child, from the sequelae of injuries and symptoms associated with their addiction and gaming disorder caused by their use of **DEFENDANTS**' Products. Josh Jameson and Tawney Jameson has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of **DEFENDANTS**' misconduct, acts, and omissions.

## THE PARTIES

40.     Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

*__The Defendants__*

41.    **DEFENDANTS** are corporations and/or limited liability companies and/or legal partnerships and/or entities incorporated, organized, and existing under and by virtue of the laws of the State of Minnesota, or the laws of some other state and/or foreign jurisdiction and which have the authority to do business in this State, and/or are doing business in this State.

42.    At all relevant times, each **DEFENDANT** was or is the parent, subsidiary (wholly or partially owned by, successor, successor in business, successor in product line or a portion thereof, or the whole or partial owner of or member of an entity that that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Products, specifically including those used by Plaintiff L.J., which the **DEFENDANTS** put into the stream commerce in a defective condition, that could, and did as to L.J. cause disordered or addicted use and severe damage to Plaintiffs. Said entities shall hereinafter collectively be called "alternate entities."

43.    Each of the **DEFENDANTS** and their alternate entities are liable to Plaintiffs for placing the Products into the stream of commerce and into Plaintiff L.J.'s hands to their detriment, and to their family's severe injury, detriment, and damage and also because the **DEFENDANTS** and their alternate entities either knew, or should have known, were aware or should have been aware, that the products were defective and unreasonably dangerous in that they incorporated addictive design features that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users, particularly minor children.

-16-

44.     Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity, or entity that it as a member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products that caused injuries as herein alleged to Plaintiffs.

45.     The **DEFENDANTS** participated in placing into the stream of commerce, individually and in concert with one another, the defective, unreasonably dangerous Products.

46.     Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting in the full course and scope of said agency, service, employment and/or joint venture.

47.     Upon information and belief, the **DEFENDANTS** committed the wrongful tortious acts alleged herein individually and agreed to and did commit the wrongful, tortious acts alleged herein in concert with one another, *i.e.*, the other **DEFENDANTS**, and/or pursuant to a common design with the other **DEFENDANTS** and/or with the knowledge that the conduct of one or more of the other **DEFENDANTS** constituted a breach of a duty and gave substantial assistance or encouragement to said others to engage

in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the other **DEFENDANTS'** individual conduct which, separately considered, constitutes breach of duty to the Plaintiffs. As such, the **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a tortious act, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such is equally liable for each of the named other **DEFENDANTS'** tortious acts or failures to act.

### *Defendant Roblox Corporation*

48.    Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

49.    Roblox Corp. is a video game developer and publisher[4] who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video gaming product, Roblox, either directly or indirectly, to members of the general public within the State of Minnesota, including to Plaintiffs.

50.    At all relevant times, Roblox Corp. acted in concert with Defendant Apple, Inc. to distribute, market, supply, and/or sell the Roblox video gaming product here at issue,

---

[4] A video game publisher is a company that publishes and distributes video games that have been developed either internally by the publisher or externally by a video game developer; often the financier behind the development of the video game, video game publishers pay third-party developers to externally develop a video game product, pay an internal staff of developers and/or internal studio team to develop the video game for the video game publisher.

and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### *Defendant Apple, Inc.*

1.     Defendant Apple, Inc. ("Apple") is a Delaware corporation with its principal place of business in Cupertino, California. Apple is licensed to do business in Minnesota and may be served with process upon its registered agent, CT Corporation System, Inc. 1010 Dale St. N, St. Paul, MN 55117-5603.

51.     Apple, at all times material hereto, acted in concert with Defendants Roblox Corp., Mojang AB, and Microsoft Corporation to distribute, market, supply, and/or sell Roblox and/or Minecraft video gaming products, including distributing, marketing, supplying and/or selling all in-game downloadable products, upgrades, and in-game purchases contained in Roblox and Minecraft, to be used with Apple's iPhone and iPad devices via Apple's App Store to increase **DEFENDANTS'** revenue at the expense of consumers throughout the State of Minnesota, including Plaintiffs.

### *Defendant Mojang AB*

52.     Defendant Mojang AB ("Mojang") is a Swedish Company with its principal place of business in Stockholm, Sweden. Mojang is a wholly owned subsidiary of Microsoft, who acquired Mojang and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang's wrongdoing in connection with Minecraft.

53.     At all times material hereto, Mojang designed, developed, tested, patented,

assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Minecraft video game products, either directly or indirectly, to members of the general public within the State of Minnesota, including to Plaintiffs.

54.    At all times relevant hereto, Mojang acted in concert with Defendant Microsoft Corporation in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft for use and play by consumers with addictive features and technologies included therein as alleged herein.

55.    At all times relevant hereto, Mojang acted in concert with Defendants Microsoft and Apple to distribute, market, supply, and/or sell its Minecraft video game products here at issue, and all downloadable products and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### *Defendant Microsoft Corporation*

56.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business in the State of Washington. Microsoft is authorized to do business in the State of Minnesota, and does business in the State of Minnesota, and its registered agent for service of process is Corporation Service Company, 2345 Rice Street, Suite 230, Roseville, MN 55113.

57.    At all times material hereto, Microsoft (independently and/or in collaboration with its video game design and development studio division, Xbox Game Studios and/or Defendant Mojang,) designed, developed, tested, patented, assembled, manufactured,

packaged, labeled, prepared, published, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Minnesota, including to Plaintiffs.

58.     At all relevant times, Microsoft acted in concert with Defendants Mojang and Apple to distribute, market, supply, and/or sell the Minecraft video game products here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Minnesota consumers, including Plaintiffs.

59.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live), including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming, which are available product features designed for use with personal computers and mobile devices operating a Microsoft Windows system, including to members of the general public within the State of Minnesota, including to Plaintiffs.

### *Defendants Jane and John Doe III-XX*

60.     Defendants Jane & John Doe III-XX  are individuals, corporations, companies, or alternate entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Minnesota—and who also may be liable for some

or all of Plaintiffs' injuries and damages as described herein.

61.    Plaintiffs, upon information and belief, allege that each Defendant designated herein as a Doe Defendant is responsible, negligently or in some other actionable manner, for the defective products and conduct herein alleged, for the injuries and damages proximately caused thereby to Plaintiffs. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a Doe Defendant tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint accordingly.

### *The Plaintiffs*

#### *Plaintiffs Josh Jameson and Tawney Jameson*

62.    Plaintiffs Josh Jameson and Tawney Jameson are, and at all times relevant to this action were, citizens and residents of the State of Minnesota whose principal place of residence are in Hennepin County, Minnesota.

63.    Josh Jameson and Tawney Jameson are the parents of Plaintiff L.J. and represent L.J.'s interests in this lawsuit.

64.    Josh Jameson and Tawney Jameson also seek redress on their own behalf for loss of society and companionship as well as for economic injuries and losses sustained as a result of L.J.'s gaming addiction, brain damage, delayed cognitive development, and other injuries proximately caused by **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages, mental anguish, emotional distress, and injuries each personally sustained as a result of

Defendants' deceptive, outrageous, fraudulent acts.

### *Plaintiff L.J.*

65.     Plaintiff L.J., a minor, is, and at all times relevant to this action was, a citizen and resident of the State of Minnesota whose principal place of residence is in Hennepin County, Minnesota. L.J. was fourteen (14) years old at the time of filing of the original Complaint.

66.     L.J. began playing video games and using **DEFENDANTS'** gateway Products at approximately seven (7) years old, and, since that time, used and/or continues to use the Products at an increasing, uncontrollable, compulsive, and/or addictive pace. L.J. has been injured and damaged—and continues to be injured and damaged—as a result of L.J.'s use of **DEFENDANTS'** Products and the addiction caused by L.J.'s use of **DEFENDANTS'** defective Products.

## JURISDICTION AND VENUE

67.     Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

68.     This *Amended and Supplemental Complaint and Demand for Jury Trial* brings forth claims for relief arising under the laws of the State of Minnesota, including but not limited to allegations that as a direct and proximate result of **DEFENDANTS** placing the defective Products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Minnesota that exceed the sum or value of $75,000, exclusive of interest and costs.

69.     This Court has original subject matter jurisdiction over the claims pursuant

to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

70.    This Court has personal jurisdiction over each **DEFENDANT** because each routinely conducts business in Minnesota and has sufficient minimum contacts in Minnesota to have intentionally availed itself to this jurisdiction by marketing Products and transacting business in the State of Minnesota.

71.    At all relevant times, each **DEFENDANT** was present and transacted, solicited, and substantially conducted business in the State of Minnesota through their employees, agents, sales representatives, and/or alternate entities, and derived substantial revenue from such business.

72.    At all times material hereto, each **DEFENDANT** targeted consumers, including Plaintiffs, to (1) purchase, play and/or use its Products and (2) to purchase in-game items or perks in exchange for real money by using operant conditioning, in-game advertising, "fake" avatar friends, and other deceptive tactics and systems.

73.    Each **DEFENDANT**—with knowledge of L.J.'s age and Plaintiffs' Minnesota residency—targeted Plaintiffs to purchase and use **DEFENDANTS'** Products; utilized deceptive and addictive mechanisms within the **DEFENDANTS'** product design to create addictive use in minors based on personal metrics and data illegally, improperly, and/or deceptively obtained from L.J. and other minors; and induced L.J. to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

74.     Upon information and belief, and at all relevant times, each **DEFENDANT** —with knowledge of L.J.'s age and Minnesota residency—provided third parties with product development tools, allowed third parties access to data obtained through consumers use of **DEFENDANTS'** Products, allowed third parties to target L.J. to use **DEFENDANTS'** Products with deceptive and addictive mechanisms within the **DEFENDANTS'** video gaming product design to create addictive use in minors based on personal metrics and data obtained from minors including L.J., and induced L.J. to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

75.     **DEFENDANTS** are conclusively presumed to have been doing business in this State and are subject to Minnesota's long arm jurisdiction.

76.     At all relevant times, **DEFENDANTS** expected or should have expected that their acts and omissions would have consequences within Minnesota and throughout the United States.

77.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## GENERAL ALLEGATIONS

78.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

### *The Video Gaming Industry*

79.    A "video game" is a device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device, and which stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** products.

80.    Gaming consoles, smartphones, tablets, and personal computers are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

81.    Early video game companies created games and sold them mostly through cartridges,  discs, or other "physical" or "hard copy" formats to be played on devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

82.    Today, video games, like Roblox and Minecraft, are available for purchase in hard copy formats and are also accessible via digital download through "app stores" and online gaming networks and cloud gaming servers for use gaming consoles, computers, mobile phones, and tablets. Each video game utilizes the same gameplay mechanisms,

designs, and technologies in its development and design regardless of whether the product is used via physical disc, digital download, online gaming network, and/or through a cloud gaming service.

83.    Cloud gaming, or gaming on demand, is a type of online video gaming product that allows users to download and/or stream video games for use on a user's console, smartphone, tablet, or personal computer without need for the physical disc; to wit, cloud gaming provides users unfettered access to an unlimited number of video games and allows users to play a single video game (e.g., Roblox, Minecraft) across multiple devices.

84.    Unlike early video games that were used and accessed (like traditional arcade video games) via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today —games that are designed to be used in conjunction with gaming consoles, mobile devices, computers, and tablets, — necessitate, if not require, a lengthy and ongoing if not continuous active participation during which time users are exposed to psychological techniques intentionally designed to control, manipulate and exploit the user's brain, and a minor's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

85.    Upon information and belief, Roblox Corp. and Microsoft/Mojang incorporate and utilize the same gameplay mechanisms, designs, artificial intelligence, systems, and technologies in each Product's development and design regardless of what device is being used and regardless of whether a user obtains and/or accesses the product

for use via a physical disc, digital download, online gaming network, and/or through a cloud gaming service.

86.    Gaming consoles, personal computers, mobile phones (e.g., iPhone,), and tablets (e.g. iPad)—and each device's associated Products (e.g. App Store and Xbox Network)—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

87.    Upon information and belief, Microsoft and Apple incorporate and utilize the same gameplay mechanisms, designs, artificial intelligence, systems, and technologies in their Product's development and design as Roblox Corp. and Mojang/Microsoft; to wit, Microsoft and Apple provide third-parties (e.g., Roblox Corp. and/or Microsoft/Mojang) with the tools, specifications, and requirements of compatibility and integration of those alternate entities video game products with Microsoft and Apple devices.

### *Monetization Schemes: Operant Conditioning and Microtransactions*

88.    The **DEFENDANTS'** placed into the stream of commerce Products designed to allow, encourage, and target people to use the products. Those products were incorporated with psychologically addictive features, properties, and technologies, including but not limited to operant conditioning, ever-changing gameplay, microtransactions, social aspects, patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

89.    Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended

to generate profit at the expense of the health of the users.

90.    Microtransactions are intentionally inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger and reinforce a disordered, addictive, and compulsive use of the products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS'** Products that include addictive design features borne from operant conditioning systems, the more that user engages in microtransactions which generates real revenue for the **DEFENDANTS.**

91.    The tremendous growth of the video gaming industry is in large part due to the advent of in-game purchasing microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the products to generate money for the **DEFENDANTS**.

92.    There is no meaningful disclosure of the inclusion of addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the time they are purchased so as to allow prospective users or their caregivers to make informed decisions as to whether using the products is desirable, appropriate, safe, or worth the potential risk.

93.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

94.    Microtransactions may be presented to users during gameplay through a custom store interface placed inside the game for which the items are being sold, in a device's "app store", or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

95.    Microtransactions, unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are a non-essential component of Products. The **DEFENDANTS** plan microtransactions with great intention.

96.    The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in if not dependent upon the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue earned by the Products remain recurring for as long as the product is available for use. When the user has an addiction or disordered compulsion to using the products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

97.    Microtransactions were intentionally and specifically designed to work in tandem with the design of operant conditioning methodology, technique, and strategy, ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time

limitation on a microtransaction offer may push a user to impulsively buy an item. Similarly, a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

98.    Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of their Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially in populations like minor children who are especially vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

99.    The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b) "Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win,

or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

100.    An additional aspect of the predatory monetization of the **DEFENDANTS'** Products is the collection and use of individual user data to manipulate the nature and presentation of in-game purchasing offers in ways that maximize the likelihood of the user spending money.

101.    The **DEFENDANTS'** Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor user's illegally obtained and improperly retained personal information and biometric data to target the user and exploit their personal data.

102.    Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more about the user of the products than the user can know about the Products. This allows the gaming industry, including the **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize the likelihood of eliciting the expenditure of real money.

103.    When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user and then employ that information to target products and microtransactions to those users based upon their interests and preferences. The prices of in-game items may be

determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity as to certain items. In this way, the products incentivize continuous spending by the user.

104.    The **DEFENDANTS** and third parties use information collected from users, including L.J. and other minors like them), in their video gaming product design and in the marketing of their Products—yet **DEFENDANTS** do not disclose and conceal these acts from those consumers, including Plaintiffs.

105.    Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers to, primarily, serve monetary goals and which lack basic transparency to the user, may also have the potential to exploit certain types of vulnerable players under certain conditions. Critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for users who are minor children to fail to understand the value of the actual money being spent which allows for more easeful and further if not continuous and chronic spending of real money.

106.    A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include but are not limited to loot boxes, rubber-banding, pay-to-win models, reward systems, fear-of-missing-out or timed events, artificial intelligence and bots, and dark patterns embedded in the product design.

107.    A "loot box" is an in-game reward system that can be purchased repeatedly— with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that

can be used to customize characters or weapons. Loot boxes are essentially a lottery that provides a way for gaming developers to increase revenue through underage gambling. It is common knowledge that gambling addiction is a severe issue that carries big risk in playing lottery-style games, so combining such gambling aspects with the psychologically addictive traits of video games makes for a highly dangerous scheme to which users are highly susceptible and will easily succumb. Loot boxes are ultimately controlled by the gaming developers as well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered and incorporated in the design of the video games. Loot boxes result in high revenues for the **DEFENDANTS** because instead of a one-time purchase for the desired item, users may and typically do buy multiple boxes.

108.    Rubber-banding is a monetization scheme used to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the user's skill level by, for example, matching computer opponents to a given user's skill level. The **DEFENDANTS** rely upon the principle of rubber-banding with microtransactions to ensure that the products' financial requirements are adjusted to match the user's desire and capacity to use. If an item costs too much, the users of monetized games cannot strategize to win and instead must decide between making in-game purchases or not using the products at all, or potentially playing without paying, but doing so with significantly diminished in-game capability, all of which generate feelings of frustration in the user, particularly a person with disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce the user's uncertainty or reluctance when faced with purchasing decisions.

109.    Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use the Products more. Users who are willing to shell out more money get a disproportionate advantage over other users, particularly if the items cannot be obtained for free. For example, users who pay money in microtransactions may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying users from progressing or remaining competitive.

110.    Dark patterns describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made. The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions; therefore, the use of "dark patterns" in product design and marketing are highly effective at influencing consumer behavior.

111.    The use of manipulative design techniques, including "dark patterns," in the digital world pose heightened risks to consumers, particularly minors. For example, the pervasive nature of **DEFENDANTS**' data collection techniques allows them to gather massive amounts of information about consumers' identities and online behavior, enabling them to adapt their product design and leverage advertisements to target a particular demographic or even a particular consumer's interests.

112.    **DEFENDANTS** use dark patterns to manipulate consumer choice in a number of ways, such as by inducing false beliefs such as a minor's belief that a skin or

other in-game purchase means the child will actually obtain the desired object or game skill level, by hiding or obscuring material information from consumers, and/or by burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

113.    Free-to-play or "freemium" games are another example of the use of dark pattern mechanisms in **DEFENDANTS**' product design because **DEFENDANTS** do not disclose to consumers that to experience the video gaming product as intended the user will need to purchase or earn (through extended game play) product upgrades. Thus, while video gameplay is ostensibly "free", the spending of real money is integral to the ability of a player, like L.J., to use the Products for their full intended purpose and the microtransactions on which that money is spent are an integral part of the inextricable tether between operant conditioning and addictive behaviors that generate revenue for the **DEFENDANTS**.

114.    Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction. Microtransactions built into many video games by design are a form of drip-pricing.

115.    Each Defendant uses, or has used at relevant times, dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of the **DEFENDANTS**' Products.

116.    The **DEFENDANTS**' use of microtransactions, individually and in concert with one another, is carried out with such efficiency that it resembles a choreographed collaboration. The **DEFENDANTS**' target users with in-game downloadable content to purchase by using algorithms and design features incorporated into the Products which, in turn, results in profit to the game developers, product publishers/distributors, and/or entities manufacturing Products intended for use with the defective video games, likewise **DEFENDANTS** herein. In addition, and simultaneously, **DEFENDANTS** herein collect data from users to target the additional video gaming products based on the user's gameplay and personal preferences inside and outside the game, to wit the user's game play, social interactions, age, name, image, likeness and other biometric data, and the like, are relied upon.

117.    The human population most vulnerable to the combination of **DEFENDANTS'** microtransaction methodology and addictive operant conditioning design features are users who are minor children and/or neurodivergent individuals. The **DEFENDANTS** know this and purposefully designed the Products to exploit that vulnerable population, including L.J., to their extreme injury, detriment, and financial loss.

118.    The **DEFENDANTS** have earned extraordinary financial revenue from minors, including L.J., as a result of placing the addictive Products into the stream of commerce.

119.    The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minor children, when used as intended and in a reasonably foreseeable manner.

120.    The **DEFENDANTS** intentionally caused and designed the Products to cause users with still developing brains to become addicted or disordered in their desire to use the products. To that avail, upon information and belief, the **DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

121.    The microtransactions and other technologies, designs, features, mechanisms, algorithms, and artificial systems and other systems the **DEFENDANTS** incorporated into the Products was done so in a manner such that users (and, when users are minor children, their caretakers) do not understand and have no way of understanding that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the **DEFENDANTS**.

### _Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products_

122.    In previous years, lopsided consumer video game monetization-related inventions, such as those identified herein, were patent ineligible. That period of time has since passed. There are now patents that protect ideas and inventions of designs features that are incorporated into video games that are intentionally designed to cause addictive and disordered use of the products that specifically target one's brains, and particularly the brains of minor children.

123.    The **DEFENDANTS** agreed to and did develop, individually and in concert

with one another, and/or made available for or did purchase or license, or otherwise caused to be incorporated into their Products one or more of this type of patented addictive design feature.

124.    The addictive design features incorporated into **DEFENDANTS**' products causes severe and irreversible injuries, harm, and damages to our society's most vulnerable members, *i.e.*, minor children, all the while lining the **DEFENDANTS'** pockets with outrageous financial profit.

125.    Several video gaming product developers have been granted patents of inventions and ideas that are designs that include addictive features and qualities which the **DEFENDANTS** intentionally incorporated into their Products which contribute to high-risk consumer behavior as alleged herein.

126.    The **DEFENDANTS'** individual and/or collective agreement—whether tacit, implicit, or explicit—to place into the stream of commerce Products that are mass-marketed to consumers, and particularly to minor children, that incorporate patented technologies of addictive design features engineered to specifically target the brains of users, serves as the ground zero through which the **DEFENDANTS'** participation in placing the Products into the stream of commerce causes users to develop an addiction or disordered use of their products, a use which generates more and more real money for the **DEFENDANTS**. In so doing, the **DEFENDANTS** have engineered a process that allows them to generate gross amounts of money from users, specifically including children, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause, all to the severe harm to the user and the user's inner circle.

127.    The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the Products of another entity, including the **DEFENDANTS'** Products. It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

128.    The patented addictive design features incorporated into the **DEFENDANTS'** Products makes those products progressively more stimulative which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the products. For instance, feedback loops continuously add new in-game downloadable products and upgrades and use tactics to ensure users are creating habits in their gameplay such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the product is curtailed by negative feedback loops.

129.    By using feedback loops and other addictive mechanisms in their product design, **DEFENDANTS** enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the Products while still rewarding the user for their

achievements, thereby making the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

130.    The feedback loops, in addition to other the psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms and other systems that are used by the **DEFENDANTS** in their product design and/or at play when the user uses the Products are designed to keep users continuously engaged. Those patented addicted invention and ideas of addictive design features and other systems that are incorporated into or otherwise working in conjunction with the Products are able to study the skill level and behavior of the user, including and even across social media platforms and website use outside of the Products. This results in the user being bombarded with solicitations to purchase additional, downloadable game components, in-game features or events, loot boxes, or other video gaming product upgrades based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the Products and other online services and platforms to cause more and more use by users, all to the user's own detriment, and to the financial benefit to the **DEFENDANTS**.

131.    The **DEFENDANTS**' decision and participation, individually and in concert, to place into the stream of commerce their intentionally addictive products has resulted in an extreme uptick of video gaming addicts and extreme gamers.

132.   The **DEFENDANTS**' participation in placing into the stream of commerce the Products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the Products, including **DEFENDANTS** herein, often seek to keep their intellectual property and/or the use of such intellectual property confidential. There are thus very few objective, transparent, or complete accounts of the precise nature of the monetization schemes employed in their Products. Nevertheless, several patents shed light on the innovative video game monetization inventions and ideas intended to lure and addict users of Products, and which are upon information and belief incorporated into the design and development of **DEFENDANTS'** products. By way of example:

a.     U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that targets users unable to complete a game scenario and encourages the user to make in-game purchases when they face such a difficult scenario. This patented design mechanism is an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster … or player character."

b.     U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, Inc., is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in video gaming products, like

**DEFENDANTS'** Products at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions comprises of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c.    U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d.    U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

e.    U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f.    U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all

-44-

players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

g.   U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with Microsoft's patent:

   i.   Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

   ii.   The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's

connection to the internet or the existence of parental controls.

h.    U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.    U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning points by scanning codes on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.    U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated

with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.    U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.    U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player

is currently operating the play the game."

m.    U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

n.    U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

o.    U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

p.    U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

q.      International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use.

*See also* US 202000030702A1, filed July 24, 2020.

133.   In addition to the above, each Product's functionality and performance is based in part upon algorithms intended to and which do manipulate the type of use a person using the product has. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, which provide a framework of artificial intelligence to monitor, analyze, and control the usage and to

increase usage time and to fuel microtransactions.[5]

134.    Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated said technology into the Products with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the Products to cause the user to want to use more and more in a disordered compulsive unhealthful manner and to drive the microtransaction engagement that inevitably occurs with that use.

135.    At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minor children and specifically including Plaintiff L.J., to use the Products and to engage via microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

136.    It is common practice for manufacturers, developers, and suppliers of Products, like **DEFENDANTS**, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buying the rights to the patent outright.

137.    Users and parents, including Plaintiffs, do not know or understand that their video gaming experience is not accidental but carefully engineered by the game manufacturers, designers, developers, and suppliers to effect, impact, and addict users regardless of the substance of the content of the video game being played.

---

[5] By way of example, see Patents assigned to Activision publishing, which is now owned by Microsoft. JUSTIA, https://patents.justia.com/assignee/activision-publishing-inc

138.    Companies employ tactics and mechanism embedded in the product design to track users spending and usage habits, and to induce them into spending money on microtransactions. For instance, when a targeted user gets stuck in the game, they are given a bonus to continue because it is better for **DEFENDANTS** to occasionally give users free things than for the players to stop paying to continue using the video gaming product.

139.    Video gaming product manufacturers, developers, and suppliers (e.g. **DEFENDANTS**) monitor users and collect user information based on game play, product usage, and the user's social networks. **DEFENDANTS** and third-parties target these users with advertisements or offers in an effort to increase their revenue at the expense of the user.

140.    Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** Products, make up 30% of the total revenue earned across the video gaming industry. The revenue is split between the developer of the game itself (e.g., Roblox Corp. and Microsoft/Mojang) and the developer of the systems, devices, and mechanisms which allow users to access and play the Products (e.g., Microsoft and/or Apple) pursuant to licensing or other contractual agreements.

141.    In addition to microtransactions, **DEFENDANTS'** Products include several additional features to keep players engaged and playing longer, including the use of artificial intelligence, algorithms, feedback loops, reward systems, dark patterns, rubber banding, skinner boxes, loot boxes, drip-pricing, and other operant conditioning systems and mechanisms, including the patented technologies identified herein and shared

technologies of other **DEFENDANTS** and other video gaming product developers to control the users experience and cause addictive behavior in users.

142.    The operant conditioning mechanisms, artificial intelligence, algorithms, feedback loops, and cloud-based gaming products are designed to keep users continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the video gaming product being used, so the game can bombard the minor with solicitations and campaigns to engage in microtransactions and to download and/or purchase additional addictive video gaming products, including the Products at issue herein.

143.    Each of the **DEFENDANTS**, with knowledge of L.J.'s age and Minnesota residency, targeted L.J. and induced them into microtransactions during their use of the Products via and as a result of the addictive design features incorporated into the products. As a result of L.J.'s use of the **DEFENDANTS'** Products, each Plaintiff was injured and damaged as herein alleged.

### _The Products at Issue Here_

144.    The purpose and functionality of Products is to provide a tangible mechanism for digital, interactive play, skill building, amusement, and thus consumption, just like any other toy, game, or gadget used or played by humans.

145.    The purpose and functionality of the patented technologies of addictive design features incorporated into the **DEFENDANTS'** Products—_i.e._, an invention or idea of addictive design culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to develop and place into the stream of commerce Products that

cause a user to develop an addictive or compulsive need to use the products which, in turn, generates revenue for the **DEFENDANTS**.

146.    The **DEFENDANTS'** defective and unreasonably dangerous Products used by L.J. were designed to and do include the patent-protected technologies and addictive design features, as well as mechanisms and systems of operant conditioning (along with illegally retained and/or obtained personal information of the players), described herein.

### *Roblox: Roblox Corp.*

147.   Roblox is an online video game, designed, developed, published, and supplied by Roblox Corp., formally released for use by consumers in September of 2006.

148.   Roblox Corp.'s "mission" for Roblox is to have a billion people actively using its video gaming products each day.

149.   Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; but with the release of Roblox for use on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of Roblox users (particularly minors) grew exponentially.

150.   Roblox Corp. markets Roblox as accessible on any device and has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



---

[6] https://corp.roblox.com/

151.    Roblox Corp. saw an accelerated increase in the numbers of consumers who downloaded and used Roblox during the onset of the Covid-19 pandemic. As of August of 2020, Roblox Corp. had over 164 million monthly active users. More than half of those users were American children under age 16.

152.    The numbers of consumers, particularly minors, using Roblox continues to grow as Roblox Corp. makes its products available for use on more devices. Currently, Roblox Corp. has over 66 million daily active users and over 217 million monthly active users; more than 50% of consumers playing Roblox are under age 13.

153.    Roblox Corp. describes Roblox as an online social gaming platform and game creation system that allows users to use games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio, such that Roblox Corp. provides users all tools necessary to "experience" and "build" their gameplay. Roblox Corp. also provides users video and written tutorials and instructions on how to use Roblox Corp.'s software, systems, tools, and a variety of "building" topics, including the use of monetization strategies and other proprietary game development mechanisms, to create and program the games that become part of Roblox.

154.    Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games, as well as to allow users to engage in purchasable, one-time "game passes" and "developer products" microtransactions, for use and purchase by other Roblox users, including, of course, minor children.

155.    Roblox Corp. profits off of each user-created game generated and developed

using Roblox Corp.'s Roblox Studio and other developer tools containing the addictive mechanisms and artificial intelligence described herein, by supplying them to consumers, including minors like L.J., as a single video gaming product.

156.    Roblox Corp. designed the social-gaming aspect of its product to allow users to use Roblox games created by other users, which includes allowing users to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

157.    Roblox is free to use, but by design encourages in-game purchases and product upgrade microtransactions which are purchased using "Robux", the product's virtual currency. Robux can be obtained in several ways: (a) purchased with real currency; (b) received as part of a recurring stipend that users with a Roblox Premium membership receive; and (c) earned from selling "game passes" or developer products" to other Roblox users.[7]

158.    Roblox Corp. markets the sale of Robux directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

159.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increase. For instance, corresponding with the Covid-19 pandemic triggered increase of Roblox users, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had already increased by 107% from 2020, and which had been an 111% increase over 2019.

---

[7] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

160.    Roblox Corp. designed Roblox to include addictive features rooted in operant conditioning and microtransactions —at the risk of children's mental and physical health— to profit from the user's extended, long-term gameplay and corresponding in-game spending.

161.    Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their products included the best psychological traits and technologies for user retention and addiction.

162.    Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, users can create games and maps for other users to try and use, a challenge in and of its own. Through research and product development, Roblox Corp. learned that when using games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the user's brain to seek those dopamine hits on a more regular and then compulsive basis that leads directly into abuse, addictive behavior, and addicted and/or disordered use of video gaming products.

163.    The variety within Roblox ensures that users are never bored nor grow tired of the product because that might cause users to want to stop using the product; there are always new challenges, maps, and characters to try out, which makes using the product feel like an ever-evolving entity that never stops providing entertainment.

164.    The ability for users to create their own games and challenges, combined with users' ability to spend real-world money to change their avatar's image and abilities, ensures that using the product / playing the game feels different for users each time they

use. Such constant variety in the experience felt by the user keeps users "hooked," coming back daily to use the product for hours.

165. Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

166. Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

167. Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the product was designed to make users play more and more to their potential harm.

168. Roblox Corp. knew its product incorporated addictive designs that posed risks of causing users to develop dangerous and disordered use and overuse of the product, to the detriment and harm to the user, and chose to not inform the consuming public at large, users, or parents of minor children who are users, of such risks.

169. Roblox Corp. describes and markets its product as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's

imagination can thrive."[8] Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



[9]

170.    While marketing its product as an educational tool beneficial to minors and neurodivergent individuals, Roblox Corp. at no point discloses the harms posed by its product or the psychology and addictive characteristics and design features of Roblox's design or that Roblox contains numerous addictive principles that can negatively impact minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

171.    Roblox Corp., in connection with Roblox, engages in the following conduct: (a) Uses a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns; (b)

---

[8] https://corporate.roblox.com/faq/
[9] https://education.roblox.com/

Allows first-party and third-party advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily; (c) Fails to adequately disclose to children when advertising is present with experiences and videos on Roblox; and (d) Fails to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

172.    Roblox Corp., independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

173.    Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

174.    Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

175.    Roblox Corp. designed Roblox with addictive psychological features to keep

users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to brain damage and injuries, but concealed this information from the public and product users, including Plaintiffs.

176.    Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury.

177.    Roblox Corp. misrepresented Roblox as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that Roblox poses significant risk of harm to users.

178.    Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video gaming product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, and that have been experienced by L.J. and other minors using **DEFENDANTS'** Products.

### *Minecraft: Mojang and Microsoft*

179.    Minecraft is a 3D sandbox video game first developed and published by Mojang, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

180. Minecraft can be played on PC, various gaming consoles, and mobile devices.

181. Since the first full release in 2011, Minecraft has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

182. In May of 2012, Mojang and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

183. The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet. With the introduction of Minecraft as a video gaming product for play on gaming consoles like Xbox 360, Mojang and Microsoft introduced microtransactions and made in-product downloadable content available for purchase.

184. All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

185. Microsoft acquired Mojang Studios and all product rights to Minecraft in 2014, and made Minecraft available for play on Xbox One and PlayStation 4.

186. On September 20, 2017, Mojang and Microsoft released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform use between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers. In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform user for persons with Xbox Live accounts.

187. The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with gaming consoles, personal computers, mobile phones, and virtual reality gaming headsets.

188. Minecraft is the best-selling video game to date, with over 300 million copies of its games sold, and with over 163 million monthly active players.

189. Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensive freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

190. While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

191. Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around

picking up and placing block-objects in a 3D grid.

192.    In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players' exploration, using a map seed that is obtained from the system clock at the time of world creation.

193.    Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight. Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world. When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard." Thus, although a single video gaming product, Minecraft gameplay can be different each and every time a player logs in to play.

194.    The main task in Minecraft is to survive all the problems using specific resources. When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling. Because of this basic game design, Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play, and therefore is a video game marketed to users from a very young age.

195.    Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of user's brains to create addictive engagement. These versions

also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

196.    Minecraft's interactive features serve only to lure players to spend more time in the game. For example, on certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

197.    Because of its game design, Minecraft can last for eternity if the player is not strong-willed enough to stop playing; to wit, once a player succeeds with one stage, they move on to the next one.

198.    Minors and players with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft.

199.    Mojang and Microsoft were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

200.    At the expense of users' mental and physical well-being, Mojang and Microsoft fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

201.    Mojang and Microsoft market the game as educational and market it to educators for use in the classroom:



**GET MINECRAFT EDUCATION FOR YOUR CLASSROOM**

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. Download Minecraft Education to get started with a free demo.

[10]

202.    Mojang and Microsoft offer teachers ready-built lessons and curriculums centered around their game:

**RESURCES** ^

Explore 500+ lessons, immersive worlds, challenges, and curriculum all at your fingertips.

Learn More

[11]

203.    The Minecraft educational game products offered by Mojang and Microsoft to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

204.    Mojang and Microsoft fail to adequately inform users of the inherent risks

---

[10] https://education.minecraft.net/en-us
[11] https://education.minecraft.net/en-us

involved with using and playing Minecraft or that the game was designed to addict and harm users.

205. Mojang and Microsoft are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

206. Mojang and Microsoft intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

207. Mojang and Microsoft have profited from the release of their addictive video gaming product to the public. For instance, in 2021, Minecraft generated approximately $380 million across all different gaming platforms.

208. Mojang and Microsoft in connection with Minecraft, engaged in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent; (b) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (c) Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to: (d) Collecting personal information, from the children in violation of state and federal law, and then suggesting that the children seek parental involvement—this limited notice of Mojang and Microsoft's information practices failed to ensure parents received adequate notice about **DEFENDANTS**' collection, use, and disclosure practices concerning children's personal information; (e)

Failing to include the information required by 16 C.F.R. § 312.4(b); (f) Failing in the direct notice to describe **DEFENDANTS**' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); (g) Not disclosing in the direct notice to parents that Mojang and Microsoft intended to collect such personal information as images that could contain a child's likeness; (h) Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Mojang, Microsoft, alternate entities, and other third parties collect personal information from children; and (i) Failing to include a complete Privacy Statement was incomplete; to wit,  until at least 2019, the Minecraft Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or Mojang's, Microsoft's, alternate entities', and other third parties' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

209.    Mojang and Microsoft have independently and in concert with each other and third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like L.J. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

210.    Mojang and Microsoft designed Minecraft to take advantage of the chemical

receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects.

211.   Mojang and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

212.   Mojang and Microsoft designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

213.   Mojang and Microsoft failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm.

214.   Mojang and Microsoft knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Mojang and Microsoft marketed and market Minecraft as "educational" and safe for use and play by minors (inside and outside the classroom).

215.    Mojang and Microsoft misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users.

216.    Mojang and Microsoft did not inform, did not warn, and concealed from the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

### *Xbox Network: Microsoft*

217.    Xbox is a video gaming brand, owned and operated by Microsoft, which consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox Network.

218.    Xbox Network is an online multiplayer gaming service created and operated by  Microsoft for use with its Xbox consoles and personal computers operating Microsoft Windows. It includes the Xbox Store and Xbox Game Pass Cloud Gaming. Xbox Network is available as a free and a paid-subscription based product, known as Xbox Game Pass. Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

219.    Microsoft developed and maintains the Xbox Store— a product-platform

through which users can purchase thousands of games to be stored and used on their personal computer through digital download.

220.    When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' computer and, if connected to the Internet, will receive product updates released by the game developer.

221.    Microsoft markets the Xbox Store as "safer for the whole family" to use.

222.    Once a game is downloaded, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

223.    This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

224.    In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

225.    Microsoft specifically designed Xbox Network to attract users to purchase games and in-game products therein—regardless of the content such games may include.

226.    Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social." This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are using and/or invite them to join your game.

227.    The Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox Network users to chat with each other individually or in groups.

To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

228.    Minors and young adults are, therefore, encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

229.    Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors and neurodivergent individuals.

230.    Microsoft is aware that several of the video games available for play on the Xbox and made available through Microsoft Windows, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

231.    Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

232.    Microsoft markets Xbox Network, the other Xbox products identified herein, and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Microsoft markets and sells Robux and Minecoins in both digital and physical gift card forms to be used on and with Xbox products.

233.    Microsoft designed Xbox Network and the Xbox Products identified herein with addictive features and for use with addictive video game products, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users.

234.    Microsoft designed Xbox Network and the other Xbox Products described herein, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products.

235.    Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

236.    Microsoft designed its Xbox Network, and including Xbox Store, Xbox Game Pass Ultimate, Xbox Cloud Gaming, and other Xbox Products by employing and/or with the help of and/or in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor users continually purchase and use addictive Products.

237.    Microsoft failed to disclose that it designed its Xbox Network and Xbox

Products with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

238.    Microsoft knew that its Xbox products contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent users—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users.

239.    Microsoft misrepresented that its Xbox Products, including those used by L.J. were safe for use by minors and neurodivergent individuals, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to L.J. and other minors using **DEFENDANTS'** Products.

240.    Microsoft knew that Xbox Network, as well as Minecraft, contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of those games and other games designed, developed and utilizing the patents and technology described herein.

241.    Microsoft did not inform the public that it designed its Xbox Products with

addictive features, or that these products could be used to download addictive Products, despite knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury and those products were designed to cause addictive and compulsive use.

242.    Microsoft, in connection with Xbox Network, engaged and/or engages in the following conduct: (a) Collecting personal information from minors who signed up to its Xbox Network without notifying their parents or obtaining their parents' consent, and by illegally retaining minors' personal information; (b) Allowing minors to create an Xbox account without confirming parental consent and, after the minors created an Xbox account, allowing minors  to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even minors, to share with third-party game and app developers; (c) Allowing—by default—all users, including minors to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their minors to access them; and (d) Using the data collected on minors less than 13 years old to use a patented system of analyzing gamer behavior, tracking said minors with their respective gamer tag, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

243.    Microsoft has independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the

information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like L.J. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *iPhone, iPad, and App Store: Apple*

244.    Apple is a manufacturer, developer, and supplier of mobile phones and tablets, specifically, the iPhone and iPad. The App Store is a product sold as a component of the iPhone and iPad that serves as a digital products store and makes applications, including Arcade, and other Products, available for to consumers for download either for free or at a cost.

245.    Apple released the App Store in 2008.  Applications and digital products made available thereon must be approved by Apple and developed within and using Apple's iOS software development kit so that the Products can be used on an iPhone or iPad.

246.    Through App Store, Apple provides a product-mechanism for users to download Products (e.g., Roblox, Minecraft) and use them on iPhone and iPads:



247.    Once a gaming app is downloaded, Apple provides a framework for "in-app billing" to initiate and process transactions. This framework enables product developers to sell Products, microtransactions and/or loot boxes through the App Store. In exchange, Apple takes 30% of all revenue generated by these microtransactions and in-app purchases.

248.    Apple does not adequately inform users of the inherent risks involved with using App Store or that App Store, Roblox, and Minecraft were designed to addict and

---

[12] https://apps.apple.com/us/app/roblox/id431946152
[13] https://apps.apple.com/us/app/minecraft/id479516143

harm users.

249.    Apple specifically designed this platform to attract and target users to



purchase Products and in-game content therein—regardless of the harmful content such

games may include. By way of example:

250.    Upon information and belief, Apple hires behavioral psychologists and

neuroscientists to design App Store and Apple's marketing of the Products in the best way

possible to attract users, especially minors and young adults.

251.    Apple is aware that several of the games on its platform that it sells and encourages users to purchase continuous in-game content are addictive and pose unreasonable risk of harm to users, particularly minors.

252.    Apple has in the past received or currently receives revenue for in-game purchases made on games downloaded through App Store o, including Roblox and Minecraft.

253.    Upon information and belief, Apple utilizes the patented addictive technologies, systems, and mechanisms identified herein, operant conditioning techniques, and other improper means to collect user's data and market their Products to consumers, including Plaintiffs.  Further, once a game or other video gaming product is downloaded via Apple App Store to a user's device or played using Arcade, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

254.    Upon information and belief, Apple provides or provided video game developers (e.g. Roblox Corp., Mojang and Microsoft) a framework to initiate and process in-game purchases and microtransactions through App Store or Arcade. This framework enables game developers to sell microtransactions and/or loot boxes through App Store or Arcade, and while the consumer is playing the video game on their device. In exchange, Apple keeps a percentage of all revenue generated by product purchases, including all microtransactions and in-app purchases.

255.    Apple, in connection with App Store, engaged and/or engages in the following conduct: (a) Employs dark patterns in the design of its App Store and in marketing video gaming products, including Roblox, Minecraft, and Xbox products. These

dark patterns include, but are not limited to, tricking someone into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges, and marketing near-miss events and other microtransactions related to Products, including the **DEFENDANTS'** products here at issue; (b) Uses dark patterns to entice minors, including L.J., into microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and (c) Collects and retains minors' voice and audio information.

256.    Apple, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like L.J. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

257.    Apple designed the App Store to market, supply, and house, inter alia, addictive gaming products to be used on and with Apple mobile products (e.g., iPhone, iPad) and to push users to make purchases of addictive Products (e.g., Roblox, Minecraft, Xbox Game Pass).

258.    Apple designed App Store in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure users, particularly minors and

neurodivergent individuals, continually purchase addictive Products.

259.    Apple designed App Store to house addictive gaming products and pushed users to make purchases through App Store, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

260.    Apple did not inform the public that it designed App Store with addictive features, or that these products could be used to download addictive Products, despite knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage, addiction, and other injury and damages.

261.    Apple designed App Store with addictive features and for use with addictive video game products, and designed App Store as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains, and to market for download and/or purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs.

262.    Apple misrepresented that App Store was safe for use by minors, while knowing that it was designed and developed with addictive features to keep users, like L.J., purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that its products pose significant risk of harm to users, like Plaintiffs.

263.    Apple knew that its App Store, as well as Roblox, Minecraft, and Xbox Game

Pass, contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but intentionally marketed its platform for play by minors and directed its misstatements towards users of Roblox, Minecraft, Xbox Game Pass, and other products designed, developed and utilizing the patents and technology described herein.

***Video Gaming Products that Incorporate Addictive Design Features Effect the User's Brain***

264.    Video gaming products, like **DEFENDANTS'** Products, incorporate addictive design features effect the user's brain.

265.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minor children as well as young adults are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which furthers impact frontal lobe development.

266.    Research has shown that prolonged use of video gaming products damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has concluded that such use of video gaming products, including **DEFENDANTS'** gateway Products, may lead to negative

effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

267.    Empirical studies indicate that gaming disorder is associated with detrimental health-related outcomes.

268.    Brain imaging studies have shown that use of video gaming products, like **DEFENDANTS'** gateway Products, negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

269.    Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants:



14

270.    Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in a way that is similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

271.    Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged use of video gaming products, including use of **DEFENDANTS'** gateway Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are:



15

272.    Brain structural studies have shown alterations in the volume of the ventral

---

[14] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[15] *Id.*

striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

273.    Other studies have shown that disordered and/or excessive use of video gaming products, like **DEFENDANTS'** gateway Products, leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

274.    Research has shown that a minor child with a diagnosis of ADHD or autism is at a higher risk of developing video game disorder or addiction which can worsen ability to control impulsivity and result in brain damage. Research has shown that while use of video games may foster creativity in children, such potential benefits are outweighed by the negative aspects of the risk of developing addiction or disordered use of video gaming products, like **DEFENDANTS'** Products, which typically develop swiftly in children and neurodivergent individuals who use video gaming products, and particularly **DEFENDANTS'** gateway Products, for extended periods of time.

275.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling. The increased dopamine released in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

276.    The use of **DEFENDANTS'** Products were designed to and do cause an

intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minor children and particularly true in neurodivergent minor children, whose brains are still developing.

277.    The repetitive release of dopamine that was designed to and does occur in minor children who are users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products more and more, first at an increasing rate and then with compulsive desire until the impulse to use the products develops into a disordered use or addiction. Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the minor child, and to the severe

emotional detriment and pecuniary or economic damage to their families and caretakers, specifically including Plaintiffs.

278.    Each Defendant specifically designed its products to addict and prey upon those users' developing brains; therefore, each Defendant is aware that its Products are addictive and proximately cause harm to minors, young adults, and neurodivergent individuals

279.    Due to the psychological and addictive aspects of the games, many of **DEFENDANTS**' products have been banned in other countries to avoid the harm to children that all **DEFENDANTS** are causing daily in the United States; however, no bans are in place here, and **DEFENDANTS** continue their pattern of addicting and harming our Nation's minors and their families, including Plaintiffs.

280.    Each Defendant is aware that its Products are addictive and proximately cause harm to minors who use those products.

### *Plaintiffs' Injuries and Damages Proximately Caused by DEFENDANTS' Misconduct and Defective Products*

281.    Plaintiffs in this matter have each suffered independent personal injuries and sequela thereto as a result of L.J.'s play use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

282.    L.J. began playing video games and using the **DEFENDANTS'** gateway Products at approximately seven (7) years old, and has continued to use the products at an increasing, uncontrollable, compulsive, and addictive pace since that time.    More specifically, L.J. began using **DEFENDANTS'** gateway Products as follows: L.J. began

playing Roblox at approximately seven (7) years old and plays or has played Roblox using Apple's iPhone and iPhone via App Store, and began playing Minecraft at approximately ten (10) years old using a personal computer via Microsoft's Xbox Network and using Apple's iPhone and iPhone via App Store.

283.    L.J.'s introduction to **DEFENDANTS'** Products was a direct result of **DEFENDANTS'** marketing of those Products to and for use by minors.

284.    L.J. accessed and obtained Roblox and Minecraft via App Store for use on their iPhone and iPad, and accessed and obtained Minecraft via Xbox Network for use on their personal computer.

285.    L.J.'s use of **DEFENDANTS'** Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered and addictive overuse in users, did so create in them a disordered, compulsive, and addictive desire and need to play with and use **DEFENDANTS'** Products at an increasing rate, to L.J.'s extreme detriment and to the exclusion of all other activities that L.J. had previously engaged as a minor child.

286.    L.J. rapidly became addicted to using **DEFENDANTS'** Products and said use was a substantial factor in causing their video game addiction, obsession with gameplay, depression, anxiety, suicidal ideation, cutting, increased need to play, loss of interest of other activities, being deceitful in hiding gameplay time or in-game spending, playing video games to escape life, disruption of growth and loss of friendships education or activities, as well as other injuries, including severe withdrawal symptoms, sleep deprivation, impulse issues, cognitive and learning problems, and gamer's rage/aggression.

287.    L.J. spends more time using the **DEFENDANTS'** Products than they engage in any other activity, including sleeping, socializing or spending time with their family, physically exercising, receiving educational instruction, or playing sports, and it is, because L.J. is an addict, the only activity L.J. desires to do and needs to do in order to avoid withdrawal symptoms.

288.    Since beginning to use **DEFENDANTS'** Products, L.J. has been diagnosed with major adjustment disorder, depression, ADHD, gaming disorder, and a learning problem. Further, as a result of the video gaming addiction and the sequalae of symptoms, injuries, and harm associated therewith including suicidal ideation, an inability to control impulsive behavior, compulsive and disordered use of **DEFENDANTS**' Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, loss of friends, fatigue, impulse issues that cause problems in relationships, poor hygiene, dishonest behavior including lying, hiding game play and product usage, and stealing money to purchase virtual currency for use in Roblox and/or Minecraft, caused by L.J.'s use of **DEFENDANTS'** Products, L.J. requires medical treatment, including out-patient counseling, medication, and specialized educational therapy, including an independent education plan at school.

289.    Currently, L.J. uses two or more of **DEFENDANTS'** Products approximately three (3) hours per day and has spent thousands of hours, in total, using **DEFENDANTS**' Products; to wit, L.J. has spent approximately 6,000 hours, in total or collectively, using **DEFENDANTS**' Products, despite the extensive efforts of Josh

Jameson and Tawney Jameson, as well as other family members and adults in L.J.'s life, to limit the time L.J. was and is using **DEFENDANTS**' Products.

290.    A combination of several factors rendered and continue to render Josh Jameson and Tawney Jameson's efforts to restrict L.J.'s usage of **DEFENDANTS'** Products futile, without medical intervention, in terms of achieving a lifestyle where L.J. is able to stop using the products without severe withdrawal symptoms, and/or for any sustainable period of time or otherwise function as L.J. did prior to when they began using the gateway Products as identified herein. Likewise, despite parental efforts to limit product usage—efforts made astonishingly difficult, if not impossible, by the addictive design of **DEFENDANTS**' Products and the absence of workable or viable parental controls within each **DEFENDANTS**' product.

291.    Among those factors impeding Josh Jameson and Tawney Jameson ability to control their child's Product usage and L.J.'s inability to restrict usage of **DEFENDANTS'** Products is the fact that L.J. is and was an "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the products. L.J.'s video game addiction was and is proximately caused by **DEFENDANTS'** defective and dangerous Product design, the absence of parental controls and time-limit restrictions within the Products, the inclusion of cross-play (the ability to use the same video gaming product on and/or via different mechanisms, devices, or systems), design features that gave the false appearance to Josh Jameson and Tawney Jameson that L.J. was using **DEFENDANTS**' Products far less than they actually were, and, finally, the **DEFENDANTS'** deception and resolve to not provide a warning to parents (including Josh

Jameson and Tawney Jameson) so as to disclose the addictive operant conditioning design incorporated into the Products so as to given them a meaningful opportunity to make an informed decision regarding the risks of using the products.

292.    L.J.'s addiction to using the **DEFENDANTS'** Products is compulsive and disordered and L.J. is incapable of restraining themselves as are others around L.J. incapable of precluding them from using the products, and any attempt on their part to do so was and is met with severe withdrawal symptoms, suicidal ideation, anger and rage that is injurious and harmful to L.J. and their parents, Josh Jameson and Tawney Jameson.

293.    L.J.'s addictive use of the **DEFENDANTS'** Products necessitates their need to chronically spend their parents' money during and throughout the hours L.J. uses the products, and L.J. has spent large sums of their parents' money, money L.J.'s been gifted, earned, or stolen, and/or used gift cards on in-game microtransactions and downloadable products that are available in and accessible through the **DEFENDANTS'** Products. These funds do not include Plaintiffs' expenditures on Robux, Roblox products, Minecoins, and/or Xbox Network.

294.    L.J. has received varied forms of treatment for their disordered and addicted use of the **DEFENDANTS'** Products due to their parents' considerable and consistent care and efforts to help L.J., albeit at a significant financial cost. L.J., to that end, has received intensive psychiatric out-patient care and medications to treat the video game addiction and other psychological disorders and conditions proximately caused by L.J.'s use of **DEFENDANTS'** Products.

295.    L.J. suffers physically, mentally, and emotionally from the injuries and harm

caused by their use of the **DEFENDANTS'** addictive products.

296.   Josh Jameson and Tawney Jameson have been injured and damaged by **DEFENDANTS'** deception and decision to design their Products to be addictive and, therefore, harmful to children like L.J.; to wit, Josh Jameson and Tawney Jameson have experienced their own mental anguish, emotional distress, pain, and suffering, along with actual financial loss and other economic injuries, due to **DEFENDANTS'** intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts with respect to the design, manufacture, distribution, marketing, sale, and supply of **DEFENDANTS'** Products – and Josh Jameson and Tawney Jameson are reasonably likely to continue experiencing those injuries and damages because of the ongoing harm caused by **DEFENDANTS'** Products and deception.

297.   Because of **DEFENDANTS'** acts and omissions with respect to their Products, as described herein, Josh Jameson and Tawney Jameson lost their ability to control their child's use of **DEFENDANTS'** Products and, if they are able to restrict L.J.'s usage, he worries about L.J.'s mental and physical condition – and fears for L.J. and his own well-being – when the Products are taken away and any restrictions must be done under the supervision of L.J.'s medical care providers. Further, because of L.J.'s video game addiction, even when Josh Jameson and Tawney Jameson are successful in restricting Product usage, L.J. will engage in deceptive and furtive actions to obtain access to the Products and play video games.

298.   None of the Plaintiffs knew that **DEFENDANTS'** Products were and are designed to be addictive and would likely harm minors if used as intended by

**DEFENDANTS**.

299.    No Plaintiff ever agreed for L.J. to be harmed or exposed to addictive products.

300.    No Plaintiff entered into a contract with any of the **DEFENDANTS** and/or to the extent any Defendant claims L.J. attempted to accept terms and conditions contained in an electronic agreement, it is void and unenforceable because L.J., a minor suffering from video game addiction and other mental health issues, lacked the capacity to contract and disaffirms any contract L.J. may have made with any **DEFENDANT** or that **DEFENDANTS** claim L.J. made with them before reaching the age of majority, disaffirmance which is demonstrated and secured by the filing of the original Complaint and the instant *Amended and Supplemental Complaint and Demand for Jury Trial*.

301.    To the extent any **DEFENDANT** claims a contractual relationship exists between itself and any Plaintiff, no such contractual relationship has ever been formed. Each of the **DEFENDANTS'** terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by users to accept and to continue to accept any new terms and conditions during the course of using the products results in a loss of access to the purchased products; and any terms to which **DEFENDANTS** claim Plaintiffs may have agreed prior to using any of the **DEFENDANTS'** Products are void and unenforceable.

302.    Further, because the **DEFENDANTS'** products were designed to and did

cause L.J. to develop an addiction or disordered compulsion to using the products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the parties to this Action are void as against public policy as an individual cannot consent to harming a minor.

303.    L.J.'s continued use of the **DEFENDANTS'** Products, even after the filing of this action, to the extent there is such use, is compulsive and due to L.J.'s disordered compulsion and addiction to using the products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties.

## **PLAINTIFFS' CLAIMS**

304.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

305.    Through the exercise of reasonable diligence, Plaintiffs could not have discovered that **DEFENDANTS**' products proximately caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

306.    Plaintiffs did not suspect and had no reason to suspect **DEFENDANTS**' products proximately caused their injuries until within the last year.

307.    Due to the highly technical nature of the **DEFENDANTS**' products, Plaintiffs were unable to independently discover that **DEFENDANTS**' products proximately caused their injuries until within the last year.

308.    **DEFENDANTS** had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed

to disclose these designs.

309.    **DEFENDANTS'** fraudulent concealment has tolled the running of any statute of limitations.

310.    **DEFENDANTS** had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially minors.

311.    **DEFENDANTS** knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

312.    **DEFENDANTS'** tortious and fraudulent acts continue to this day; as of the date of this *Amended and Supplemental Complaint and Demand for Jury* Trial, **DEFENDANTS** have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

313.    Despite their knowledge of the defects and their attendant safety risks, **DEFENDANTS** continue to market their products to minors—and even their educators— while simultaneously omitting the disclosure of known and foreseeable harms.

314.    Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of **DEFENDANTS'** acts and omissions.

315.    For the foregoing reasons, **DEFENDANTS** are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by

**DEFENDANTS'** active concealment with respect to all claims against **DEFENDANTS**.

## COUNT I
## STRICT LIABILITY - DEFECTIVE DESIGN

316.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as though set forth fully herein.

317.    At all relevant times, each Defendant placed the Products used by L.J. into the stream of commerce.

318.    The **DEFENDANTS**, at all relevant times, have marketed and advertised the video gaming products at issue herein throughout the United States, including in Minnesota, for personal use by end-users/consumers of all ages, including minors, and specifically L.J..

319.    The **DEFENDANTS** are, individually and/or in concert with one another, designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective video gaming products, whether in design or in failing to warn about, and each is strictly liable to Plaintiffs herein for the harm and injuries and damages said products caused.

320.    Each Product is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors and young adults, throughout the world, including in Minnesota.

321.    Each Defendant markets and advertises their Products, in Minnesota and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors.

322.    The Products the **DEFENDANTS** placed into the stream of commerce were

defectively designed; to wit, designed to cause addictive and compulsive use of the products, including by minors, and which did in fact and proximately cause addictive, disordered use by L.J. and injuries and damages as a result.

323.    Each Defendant defectively designed its Products to addict minors and young adults who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products.

324.    The design defects were present in the **DEFENDANTS'** Products when the products left the hands of the **DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the general consuming public to be used in their intended and foreseeable manner.

325.    The defects in the design of each Defendant's Products existed prior to the release of these products to L.J. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to L.J. via download or URL access (in regard to digital game copies and cloud gaming).

326.    L.J. used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that L.J. would use these products without Plaintiffs inspecting them for and/or being unable to discover their addictive nature.

327.    Each Defendant defectively designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users, and to take advantage of the chemical reward system of

a user's brain (especially that of a minor, young adult, and/or neurodivergent user) to create and cause addictive engagement, compulsive use, and additional mental and physical harm.

328. Each Defendant's Products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

329. Minors, including L.J., are among the ordinary consumers of **DEFENDANTS'** Products.

330. Minors and young consumers, and their parents and guardians, do not expect: (a) **DEFENDANTS**' Products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its Products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

331. Each Defendant's Products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals leading to a cascade of harms. Those harms include, but are not limited to,

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

332.    The **DEFENDANTS'** Products did cause users to develop a disordered, compulsive, and addictive use of those products, including L.J., to their detriment and harm, and that of their caregivers, Josh Jameson and Tawney Jameson.

333.    The **DEFENDANTS**' Products were defective and unreasonably dangerous when they left the **DEFENDANTS**' possession and control. The defects continued to exist through the products' distribution to and use by consumers, including L.J., who used the products without any substantial change in the products' condition.

334.    Said defective designs of the **DEFENDANTS'** Products was and continues to date to be suppressed and concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical reward system of the user's brain (especially a minor's brain) to create addictive engagement and compulsive use of the Products, without regard for consequential mental and physical harm. Said series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiffs as alleged herein.

335.    The **DEFENDANTS'** products did not perform as safely as an ordinary consumer would have expected, are more dangerous than other Products because they were intentionally designed to be addictive to those using them, and specifically to minor and neurodivergent users, which causes a myriad of potential injuries and harm and damages, and which here did result from L.J.'s use of **DEFENDANTS**' Products.

336.    The risks inherent in the design of each Defendant's Products significantly

outweigh any benefit of such design.

337.   Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to: (a) Choosing not to use "addictive" patents identified herein in the game design; (b) Redesigning gaming software to limit rather than promote addictive engagement; (c) Implementing robust age verification; (d) Implementing effective parental controls; (e) Implementing effective parental notifications; (f) Warning of health effects of use and extended use upon sign-up or log-in; (g) Implementing default protective limits to the length and frequency of gaming sessions; (h) Implementing opt-in restrictions to the length and frequency of gaming sessions; (i) Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports; (j) Implementing blocks to use during certain times of day (such as during school hours or late at night); (k) Implementing limits on number of games playable per day; (l) Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer; (m) Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day; (n) Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and (o) Others as set forth herein.

338.   Alternative designs were available that would reduce neurodivergent users, young adults, and minors' addictive and compulsive engagement with each Defendant's

Products, and which would have effectively served the same purpose of **DEFENDANTS**'

products while reducing the gravity and severity of danger posed by those products'

defects.

339.  L.J. used the **DEFENDANTS**' products as intended and/or in reasonably

foreseeable ways.

340.  As a direct and proximate result of their use of the **DEFENDANTS**'

defectively designed products, L.J. sustained physical and mental injuries, emotional

distress, pain, suffering, mental anguish, and economic injuries and damages.

341.  L.J.'s injuries and damages were reasonably foreseeable to each Defendant

at the time of their Products' development, design, advertising, marketing, promotion, and

distribution, especially considering each Defendant's conduct—described herein and

including, but not limited to, specifically designing their Products to be addictive.

342.  The defective design of the **DEFENDANTS'** Products used by L.J. was a

substantial factor in causing harm to L.J.

343.  As a direct and proximate result of **DEFENDANTS**' Products' defective

design, L.J. became a video game addict and  sustained injuries, which include brain

damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to

learn and be educated, mental harm, emotional distress, pain, suffering, and mental

anguish.

344.  L.J. were injured as a direct and proximate result of the **DEFENDANTS**'

defective Products, as described herein, and Plaintiffs suffered economic damages as a

result thereof.

345.    The defective design of **DEFENDANTS**' Products, as identified and described herein, is a proximate cause of the harm and injuries to L.J.

346.    Plaintiffs' damages, which were proximately caused by **DEFENDANTS**' defective design, are L.J.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to L.J.'s physical and mental injuries. L.J.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

347.    **DEFENDANTS** are strictly liable due to the defective design of their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

348.    Each Defendant, in defectively designing their Products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

349.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

350.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products.

351.    The conduct of each Defendant, as described above, was intentional,

fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including L.J., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN

352.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

353.    At all relevant times, each Defendant placed the Products used by L.J. into the stream of commerce.

354.    **DEFENDANTS'** products are designed and intended to be gaming products and are marketed and advertised to the public, in Minnesota and throughout the United States, for the personal use of the end-user/consumer.

355.    **DEFENDANTS'** Products are also marketed and advertised to minors, young adults, and neurodivergent individuals in Minnesota and throughout the United States.

356.    None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

357.    None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, brain damage, and impaired cognitive and emotional development.

358.    **DEFENDANTS** sold and distributed the Products to L.J. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to minors as described herein, including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

359.    **DEFENDANTS'** Products are dangerous, to an extent beyond that contemplated by the ordinary user who used **DEFENDANTS'** products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use, and cause a cascade of other harms as described herein.

360.    Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to minors, young adults, and neurodivergent users considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

361.    **DEFENDANTS'** Products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things: (a) **DEFENDANTS'** Products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

(b) **DEFENDANT'S** Products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries; (c) The feedback loops and strategized patented material in **DEFENDANTS'** Products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction; (d) New users of **DEFENDANTS'** Products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians; (e) The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and (f) The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

362.    Ordinary users could not and/or would not have recognized the potential risks of **DEFENDANTS'** Products when used in a manner reasonably foreseeable to each **DEFENDANT**.

363.    **DEFENDANTS'** Products were defective and unreasonably dangerous when they left the **DEFENDANTS'** possession and control without reasonable instructions and/or warnings regarding the harm outlined herein.

364.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using **DEFENDANTS'** Products, Plaintiffs would have heeded the warnings and/or

instructions.

365.   Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

366.   Each Defendant, in failing to warn consumers and end-users that their Products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

367.   As a direct and proximate result of each Defendant's failure to warn, L.J. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

368.   **DEFENDANTS** are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

369.   Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

370.   The nature of the fraudulent and unlawful acts that created safety concerns for L.J. are not the type of risks that are immediately apparent from using **DEFENDANTS'** Products. As a proximate result of the **DEFENDANTS'** conduct in making their games addictive, L.J. continue to use **DEFENDANTS'** Products. When L.J. use **DEFENDANTS'**

Products, Plaintiffs will not be independently able to verify whether **DEFENDANTS'** Products continue to pose an unreasonable risk or rely on **DEFENDANTS'** representations in the future.

371.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including L.J., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT

372.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

373.    **DEFENDANTS'** Products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

374.    **DEFENDANTS'** Products are marketed and advertised to minors.

375.    **DEFENDANTS** sold and distributed the Products to L.J. in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by minors was reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

376.    **DEFENDANTS'** Products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

377.    **DEFENDANTS** knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by minors.

378.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to minors. These risks were known and knowable in light of e **DEFENDANTS'** own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to L.J..

379.    **DEFENDANTS** knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of **DEFENDANTS'** Products including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

380.    **DEFENDANTS'** Products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to instruct users with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

381.    Ordinary users would not have recognized the potential risks of Defendants'

products when used in a manner reasonably foreseeable to each of the Defendants.

382.  At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

383.  Had Plaintiffs received proper or adequate instructions regarding the risks of the **DEFENDANTS'** Products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

384.  Each Defendant's failure to adequately instruct Plaintiffs regarding the risks of each of the Defendant's respective products and the need to alter L.J.'s game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

385.  As a direct and proximate result of each Defendant's failure to instruct, L.J. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

386.  Defendants are strictly liable due to each Defendant's failure to instruct regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

387.  The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous.  Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including L.J., and warrants an award of

punitive damages in an amount—imposed by the jury at trial—sufficient to punish each

Defendant and deter others from like conduct.

## COUNT IV
## NEGLIGENCE – NEGLIGENT DESIGN

388.    Plaintiffs reallege and incorporate by reference all of the foregoing

allegations as if repeated in full here.

389.    Each Defendant knew or, by the exercise of reasonable care, should have

known, that its Products were dangerous, harmful, and injurious when used by minors,

young adults, and neurodivergent individuals in a reasonably foreseeable manner.

390.    Each Defendant knew or, by the exercise of reasonable care, should have

known that its Products posed risks of harm to minors, young adults, and neurodivergent

individuals. These risks were known and knowable in light of each Defendant's own internal

information and knowledge regarding its products at the time of the products' development,

design, marketing, promotion, advertising, and distribution to L.J.

391.    Each Defendant knew, or by the exercise of reasonable care, should have

known, that ordinary consumers such as Plaintiffs would not have realized the potential

risks and dangers of the **DEFENDANTS**' Products. Those risks include brain damage,

abuse, addiction, and compulsive use in minors, young adults, and neurodivergent

individuals, and which can lead to a cascade of negative effects including but not limited to

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on

cognitive processes, and other harmful effects.

392.    **DEFENDANTS** knew that minors, young adults, and neurodivergent

individuals would use its Products.

393.    Despite this knowledge, **DEFENDANTS** designed the Products to create addictive engagement and compulsive use, including spending, in foreseeable users, including Plaintiffs.

394.    Each Defendant, as video gaming product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

395.    Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

396.    Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including L.J.

397.    Each Defendant owed these duties to Plaintiffs, and particularly to L.J.  as the foreseeable end-users.

398.    Each Defendant breached the duties owed to Plaintiffs, and particularly to L.J.  These breaches include, but are not limited to: (a) Utilizing patented designs and technology for purposes of addicting users to the Defendant's Products; (b) Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to minors, who are particularly unable to appreciate the risks posed by the products; (c)

Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (d) Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (e) Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in minors, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and (g) Otherwise failing to use ordinary care in the design of the products.

399.   Alternative designs that would reduce the addictive features of **DEFENDANTS**' Products were available, would have effectively served the same purpose as each Defendant's defectively designed products, and would have reduced the gravity and severity of danger **DEFENDANTS**' Products posed minors, young adults, and neurodivergent individuals, including the danger and harm experienced by L.J.

400.   A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

401.   At the time each **DEFENDANTS** put its products into the market in Minnesota and throughout the United States, the products were defective as outlined herein, and at the time L.J.  received and used each Defendant's products, the products

remained defective.

402.    At all relevant times, L.J. used the **DEFENDANTS**' Products in the manner in which they were intended by **DEFENDANTS** to be used.

403.    As a direct and proximate result of each Defendant's breached duties, Plaintiffs were harmed.

404.    The **DEFENDANTS**' design of their Products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

405.    As a direct and proximate result of each Defendant's breached duties, L.J. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

406.    As a direct and proximate result of each Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

407.    **DEFENDANTS** negligently designed their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – NEGLIGENT FAILURE TO WARN

408.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

409.    Each Defendant knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a

reasonably foreseeable manner, particularly by minors, young adults, and neurodivergent individuals.

410.    Each Defendant knew or, by the exercise of reasonable care, should have known that the Products posed risks of harm to minors. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to L.J.

411.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers, and particularly minors like L.J.,  would not have realized the potential risks and dangers of the **DEFENDANTS**' products including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

412.    Each Defendant knew that minors, including L.J., would use its Products.

413.    **DEFENDANTS** failed to give appropriate warnings about the risks of their products. None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

414.    None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage

in neurodivergent individuals.

415.    Had Plaintiffs received proper or adequate warnings about the risks of **DEFENDANTS'** Products, Plaintiffs would have heeded such warnings.

416.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

417.    Each Defendant had a duty to warn and/or instruct about particular risks of their Products, both before and after leaving a Defendant's possession.

418.     Each Defendant owed these duties to users including L.J.

419.    Each Defendant breached the duties owed to L.J., a foreseeable user. These breaches include, but are not limited to: (a) Failing to warn users that **DEFENDANTS'** Products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries; (b) Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of **DEFENDANTS'** Product; (c) Failing to adequately instruct Plaintiffs regarding the risks of **DEFENDANTS** Products and the need to alter L.J.'s game play to avoid such risks; and (d) Otherwise failing to warn and/or instruct product users, including Plaintiffs, of the risk and harm associated with normal, foreseeable, and intended use of **DEFENDANTS'** Products.

420.    A reasonable company under the same or similar circumstances as **DEFENDANTS** would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

421.    At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

422.    Had Plaintiffs received proper or adequate instructions regarding the risks of **DEFENDANTS**' Products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

423.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

424.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their Products, as identified herein, and that negligence proximately caused harm to Plaintiffs; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE – FAILURE TO INSTRUCT

425.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

426.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, as the risks and dangers are unknown and not reasonably discoverable by users.

427.    Each Defendant breached its duty by failing to provide reasonable and

adequate instructions to L.J., a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of safe use to avoid the risks and harm built into each Defendants' respective gaming products.

428.    A reasonable company under the same or similar circumstances as each Defendant would have provided adequate instructions to consumers, including minor users and their parents and/or guardians.

429.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein

430.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

431.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

432.    As a direct and proximate result of each Defendant's failure to instruct, L.J. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

433.    Plaintiffs have also incurred economic losses that they would not have incurred but for the addictive and harmful propensities of **DEFENDANTS'** Products.

434.    Each Defendant negligently failed to instruct consumers, including Plaintiffs,

of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT VII
## NEGLIGENCE – ORDINARY NEGLIGENCE AND NEGLIGENCE PER SE

435.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

436.   Each Defendant owed L.J. a duty to act as a reasonably careful company would under the circumstances.

437.   Each Defendant has breached the duties owed to L.J.

438.   A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

439.   A reasonably careful company would protect L.J. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

440.   A reasonably careful company would not invite, encourage, or facilitate minors, such as L.J., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

441.   A reasonably careful company would disclose that it designed its video gaming product(s) with addictive properties to take advantage of the chemical reward

system of a user's brain, to create addictive engagement, and would disclose the serious safety risks presented by its Products; yet each Defendant failed to do so while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

442.   L.J. were foreseeable users of the **DEFENDANTS**' Products.

443.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of L.J.'s use of **DEFENDANTS**' Products.

444.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of the Products was dangerous, harmful, and injurious when used by minors such as L.J. in a reasonably foreseeable manner.

445.   Each Defendant knew this or should have known this because each designed its product with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

446.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that the Products (as developed, setup, managed, maintained, supervised, and operated by **DEFENDANTS**) posed unreasonable risks of harm to minors such as L.J., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

447.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minors using the Products, such as L.J., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

448.   Each Defendant's conduct was closely connected to L.J.'s injuries and Plaintiffs' damages, which were highly certain to occur.

449.   Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed L.J..

450.   Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiffs.

451.   A reasonable company engaged in the manufacture, design, development, and supply of Products to minors would comply with federal and state laws designed to protect children in online spaces (e.g., 15 U.S.C. § 6501 *et seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*,); yet the **DEFENDANTS** did not do that.

452.   Each Defendant has improperly and illegally collected or used personal information from children younger than age 13 by, at least: (a) Failing to provide through their video gaming websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R.

§ 312.4(a) and (c); (b) Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); (c) Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1); (d) Processing the personal information of minors, including L.J., with actual knowledge of and in willful disregard that the processing of that information may result in substantial harm or privacy risk to L.J.; (e) Profiling minors, including L.J., without appropriate safeguards in place to protect children, and without such profiling of minors, including L.J.,  being necessary for the function of the Products and/or without demonstrating that such profiling does not pose a threat to minors, including L.J.; (f) Collecting, selling, sharing, and retaining personal information of minors, including L.J., that is not necessary to use **DEFENDANTS'** Products; (g) Using the personal information of minors, including L.J., for reasons other than the purpose for which the personal information is collected, including but not limited to selling that information to third-parties and using such information for advertising, marketing, and design purposes; (h) Collecting, selling, and sharing any precise geolocation data of children, including L.J., including but not limited to selling that information to third-parties and using such information for advertising, marketing, design, and matchmaking purposes; (i) Collecting any precise geolocation data of children, including L.J., without providing an obvious sign to the child for the duration of the collection that the precise geolocation is being collected; (j) Using dark patterns that lead or encourage children to provide personal information beyond what

personal information would otherwise be reasonable expected to be provided for the use of **DEFENDANTS**'' Products, including but not limited to using dark patterns in matchmaking systems, marketing, microtransactions, and other product design features; (k) Using any personal information collected from users, including L.J., to estimate their age or age range for purposes beyond age verification; (l) Retaining personal information collected from users, including minors like L.J., longer than necessary to estimate the user's age; and (m) Otherwise acted in conflict with state and federal law regarding the protection of children in online spaces, which includes **DEFENDANTS**' Products.

453.    At all relevant times, each Defendant collected and/or used personal information from minors using **DEFENDANTS**' Products, including L.J., in the ways described above; the **DEFENDANTS'** actions were negligent.

454.    Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services; the **DEFENDANTS**' collection of this information is negligence.

455.    Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

456.    Each Defendant's negligent acts and omissions in violation of state and federal law harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or

unknowingly make in-game purchases using the game patents and other illegal dark patterns.

457.    **DEFENDANTS** have violated statutory and regulatory law, as identified herein, and because Plaintiffs were or have been at all times relevant within the class of persons those statutes and regulations are designed to protect—and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—each **DEFENDANT** is *per se* negligent.

458.    Each Defendant's actions with respect to their Products at issue fell below that which a reasonable company would do when knowingly designing and marketing toys for children; to wit, reasonable companies would not (as **DEFENDANTS** did here): (a) Profile minors in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns and/or to knowingly target minors to addict them to **DEFENDANTS**' products so **DEFENDANTS** can increase profits as much as possible; (b) Process minors' information with a willful disregard for the harms outlined herein; (c) Collect and retain information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to minors; and (d) sell and/or allow to be sold a minor user's personal information and biometric data.

459.    Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using **DEFENDANTS**' Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable

care, and how to alter regular gameplay in order to avoid such risks; yet, no Defendant provided any such instruction.

460.   Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of Defendants' Products. Those breaches include: (a) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including L.J.; (b) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including L.J., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (c) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including L.J.; (d) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including L.J.; (e) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including L.J., including but not limited to dissociative behavior,

-125-

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including L.J.; (g) Developing, patenting, and licensing unreasonably dangerous features and algorithms for Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like L.J.; (h) Maintaining unreasonably dangerous features and algorithms in their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like L.J.; (i) Facilitating use of their Products by minors under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols; (j) Failing to implement effective protocols to block users under the age of 13; (k) Failing to implement effective parental controls; (l) Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by minors, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse; (m) Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable content, product upgrades, and/or microtransactions; (n) Failing to implement reasonably available means to limit or deter use of products by minors during ordinary times for school or sleep; (o) Failing to implement reasonably available means to set up and operate its products without

features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage minors users; and (p) Otherwise failing to act as a reasonable company would under similar circumstances.

461.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from **DEFENDANTS**' gateway Products.

462.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of minor users like L.J.; yet **DEFENDANTS** did not do this. This was a breach of duties owed to Plaintiffs.

463.    As a direct and proximate result of each Defendant's breach of one or more of its duties, L.J. have been injured and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS'** products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

464.    As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of L.J.'s injuries and damages.

465.    As a direct and proximate result of each Defendant's breach of duties, L.J. has and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

466.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an

amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

467.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

468.   The **DEFENDANTS** outrageous, extreme, and reckless conduct, as described herein, caused Plaintiffs to experience extreme emotional distress; and that misconduct includes but is not limited to:

a.   Each Defendant intentionally designed its Products to addict minor, young adult, and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by **DEFENDANTS**' products and were particularly susceptible to harms from those products.

b.   Each Defendant intentionally designed its Products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm;

c.   Each Defendant designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

d.   **DEFENDANTS** intended for their products to be psychologically and neurologically addictive when used in their intended manner by their

intended audience; and intended for minors, like L.J., to use each **DEFENDANTS'** video gaming product and intended for users, like L.J., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of **DEFENDANTS'** conduct and immoral tactics;

e.   **DEFENDANTS** knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their Products;

f.   Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its Products and gaming products; and

g.   Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

469.   Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors, young adults, and neurodivergent individuals—was intentional, reckless, extreme, and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

470.   Each Defendant knew users, like L.J., would likely become addicted to **DEFENDANTS'** Products because each Defendant designed and developed their Products to become more stimulative over time, to maximize young consumers' usage time, and to

addict them so **DEFENDANTS** can continue to profit off users, including L.J., after initial purchase or download.

471.   Each Defendant knew that when users, like L.J., became addicted to **DEFENDANTS'** Products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

472.   Each Defendant intended to inflict emotional distress *(e.g.*, causing addiction) on users, like L.J., and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of **DEFENDANTS'** conduct.

473.   Plaintiffs have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

474.   Further, L.J.'s family has endured bouts of gamer's rage and emotional disturbances by L.J..

475.   **DEFENDANTS'** conduct—individually and collectively—including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

476.   No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiffs.

477.   As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, L.J. have experienced extreme emotional distress and will require additional treatment for their mental health conditions proximately caused by

**DEFENDANTS'** outrageous behavior.

478.    As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, Josh Jameson and Tawney Jameson has experienced severe emotional distress that has resulted in pain, suffering, and mental anguish, including having to witness L.J. suffer from addiction, pain, and mental distress caused by **DEFENDANTS'** outrageous conduct.

479.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

480.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous.  Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including L.J., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT IX
## DECEIT – FRAUDULENT MISREPRESENTATION, FRAUDULENT OMISSION AND NONDISCLOSURE, AND FRAUDULENT CONCEALMENT

481.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

482. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by L.J..

483. As detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users, particularly minors.

484. Each Defendant knew their Products posed risk to minors, like L.J., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like L.J., to purchase/download the game and to continue using DEFENDANTS' products to the addiction knowingly caused by DEFENDANTS' products.

485. Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the products posed serious health risks to users, particularly minors. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

486. Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its Products.

487. Each Defendant intentionally omitted or knowingly did not disclose material facts about their Products, or their collective use of patents designed to addict players to DEFENDANTS' products.

488. Each Defendant concealed the serious safety risks presented by its Products,

including **DEFENDANTS**' concealment from the public, including Plaintiffs, that each Defendant designed its Products with addictive psychological features to take advantage of the chemical reward system of users' brains, to trick and induce users into purchasing addictive Products, and to keep users playing more often and for longer periods of time, despite **DEFENDANTS**' knowledge that abuse, addiction, and compulsive use of **DEFENDANTS**' Products by minors and neurodivergent people can lead to brain damage, addiction, and other injuries.

489.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce minors, including L.J., to continue using its Products and avoid losing users and revenue.

490.    Each Defendant knew that its concealment was material.

491.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

492.    In addition to hiding and concealing the dangers of their Products, each Defendant made material misrepresentations (and others) about their Products while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

493.    **DEFENDANTS**' false representations involve, but are not limited to, material misstatements about the safety of **DEFENDANTS**' Products, and other misstatements identified herein and made directly to consumers, including Plaintiffs.

494.   Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

495.   Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

496.   **DEFENDANTS**' omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products.

497.   If **DEFENDANTS** had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Josh Jameson and Tawney Jameson would not have allowed L.J. to use **DEFENDANTS**' Products and would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

498.   As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

499.   As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

500.   As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, L.J. have been injured and Plaintiffs have sustained damages, as described herein.

501.   Each Defendant took affirmative steps to conceal the true nature and risk posed by their Products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the **DEFENDANTS** and deter others from like conduct is warranted.

502.   The **DEFENDANTS**' fraudulent concealment tolls any applicable statute of limitations.

503.   At all relevant times, within **DEFENDANTS**' Products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with **DEFENDANTS**' products.

504.   Users of **DEFENDANTS**' products, including minors, young adults, and neurodivergent individuals such as L.J., were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each Defendant's products.

505.   **DEFENDANTS**' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, ARTIFICIAL INTELLIGENCE avatars or "friends" to encourage purchase, and disguised features of the **DEFENDANTS**' products, which misrepresent to users, like L.J., that game-selected purchases would help them advance in the game or complete necessary missions.

506.   **DEFENDANTS** made these false representations and material nondisclosures with intent that product users, like L.J., spend money on microtransactions.

507.   At the time each Defendant utilized these technologies to deceive L.J., and each Defendant knew that the representations made through the game were false and existed only to entice L.J. to continue spending.

508.   Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like L.J.

509.   At the same time, each Defendant knew that misrepresentations served only to increase users'—including L.J.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

510.   L.J. reasonably relied on **DEFENDANTS**' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value

to L.J..

511.    Josh Jameson and Tawney Jameson relied on **DEFENDANTS'** misrepresentations about the Products and allowed L.J. to use **DEFENDANTS'** Product with no knowledge of the harm and danger the Products posed to minors.

512.    Had Plaintiffs known that the representations in each Defendant's Products regarding in-game purchases were false and fraudulent, and the result of **DEFENDANTS'** use of patented technologies, Josh Jameson and Tawney Jameson never would have allowed L.J. to use **DEFENDANTS'** Prodducts and L.J. never would have purchased **DEFENDANTS'** Products or spent money on additional in-game downloadable content or microtransactions built into the product design.

513.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users but did not tell Plaintiffs and actively misrepresented otherwise.

514.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like L.J., would continue using each Defendant's Products.

515.    Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their Products were safe or even beneficial for children to use.

516.    Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs,

to purchase, download, play, continue to use, and/or purchase the Products.

517. By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its Products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase the Products.

518. Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like L.J., would be induced into spending money that they would not spend on **DEFENDANTS**' products if they knew the truth.

519. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing the Products.

520. As a direct and proximate result of each Defendant's fraudulent misrepresentations, omissions, and concealment, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's Products, and/or purchasing in-game product transactions in each Defendant's product.

521. As a direct and proximate result of each Defendant's concealment of material

information, Plaintiffs have been financially and otherwise harmed through each Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

522.    By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its Products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

523.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

524.    The misrepresentations described herein were made to Plaintiffs— particularly to L.J. —prior to their purchase of each Defendant's product and to L.J. while each of them was using **DEFENDANTS**' products as intended.

525.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase the Products.

526.    Plaintiffs relied on **DEFENDANTS**' material misstatements and false representations in deciding whether to use, or continue to use, each of **DEFENDANTS**' products; specifically, Roblox and the Apple Store App.

527.    Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchase the Products was justifiable and reasonable under the circumstances.

528. As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* **DEFENDANTS**' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

529. As a direct and proximate result of each Defendant's material misrepresentations and false statements (*e.g.,* **DEFENDANTS**' deceit), Plaintiffs have been damaged. Such damage includes L.J.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; L.J.'s inability to attend school; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to L.J.'s physical and mental injuries. L.J.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

530. Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

531. In conjunction with **DEFENDANTS**' acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

## COUNT X
## NEGLIGENT MISREPRESENTATION

532.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

533.   Each Defendant had a pecuniary interest in the Products used by L.J.

534.   Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of Products having a pecuniary interest in these Products—had a duty to communicate accurate information and to make truthful statements of material fact to the public about their Products. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of **DEFENDANTS**' products used by L.J. and that those products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

535.   As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its Products pose serious health risks to users, particularly minors, including L.J.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use.

536.   Each Defendant made false statements and misrepresentations with intent to

induce Plaintiffs (and the general public) to purchase and use their Products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

537. Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

538. **DEFENDANTS'** false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use **DEFENDANTS'** products—and Josh Jameson and Tawney Jameson relied upon **DEFENDANTS'** false statements and misrepresentations in allowing L.J. to use **DEFENDANTS'** games and gaming products, Likewise, L.J. relied on **DEFENDANTS'** false statements and misrepresentations in conjunction with in-game purchases and **DEFENDANTS'** deceptive microtransaction mechanisms, including the use of fake "friends" to induce L.J. into spending money.

539. Plaintiffs' reliance on **DEFENDANTS'** false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

540. Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to L.J.'s addiction to, or compulsive or excessive use of, **DEFENDANTS'** products, and a cascade

of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each Defendant's material misrepresentations, L.J. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

541.    Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of **DEFENDANTS**' Products.

## COUNT XI
## CIVIL CONSPIRACY

542.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

543.    A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

544.    The **DEFENDANTS** conspired to addict users, including L.J., to **DEFENDANTS**' Products.

545.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like L.J., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and

specifically developed and designed their products to cause and that was experienced by L.J. and other users.

546.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each **DEFENDANTS** to utilize the same patents to keep users, including minors like L.J., addicted to **DEFENDANTS**' products.

547.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like L.J., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

548.    As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Apple to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Minnesota's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

549.    As described herein, Mojang and Microsoft knowingly conspired and otherwise acted in concert with each other, and with Apple, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Minnesota's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

550.   As described herein, Apple knowingly conspired and otherwise acted in concert with Roblox Corp., Mojang, and Microsoft to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Minnesota's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

551.   The **DEFENDANTS** knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Products, and that addicted and harmed L.J.

552.   As described herein, the **DEFENDANTS** conspired with and acted in concert with each other to distribute, market, supply, and/or sell the Products. contained in an effort to increase' revenue at the expense of consumers, including Plaintiffs.

553.   Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its video gaming product to users, including L.J., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

554.   Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including L.J.

555.   These conspiracies allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, like Plaintiffs.

556.   Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

557.   Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

558.   The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' products. As a proximate result of **DEFENDANTS**' conspiring to make their Products addicting, Plaintiffs continue to suffer injuries and damages as L.J. are unable to stop using **DEFENDANTS**' Products as a result of their addiction, **DEFENDANTS**' defective product designs, and **DEFENDANTS**' failure to warn consumers, like Plaintiffs, about the harmful and addictive qualities and components of those Products.

## COUNT XII
## IN-CONCERT LIABILITY

559.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here,

560.  In-concert, or shared, liability arises where one party acts in concert with another tortfeasor.

561.  As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like L.J., with unfair and deceptive trade

practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by L.J. and other users.

562.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each Defendant to utilize the same patents to keep users, including minors like L.J., addicted to **DEFENDANTS**' products.

563.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like L.J., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

564.   Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

565.   Each Defendant knew of the risk of abuse, addiction, and compulsive use by minors, including L.J., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other **DEFENDANTS** to do the same.

566.   Additionally, the **DEFENDANTS** acted in concert with one another to place addictive games and technology in the Products and to encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

567.   **DEFENDANTS**  do not place any restrictions on game developers collecting

and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including L.J., can spend playing games. Each Defendant acted in concert and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

568. Such concerted conduct allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, including Plaintiffs.

569. Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

570. Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

571. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' products.

572. As a proximate result of **DEFENDANTS**' conspiring and acting in concert to make their games addicting, L.J. continues to suffer injuries and is unable to stop using **DEFENDANTS**' Products as a result of L.J.'s addiction, **DEFENDANTS**' defective design and **DEFENDANTS**' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

573. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused L.J.'s addiction and Plaintiffs' damages, as described herein.

574. For these reasons, **DEFENDANTS** have shared liability for Plaintiffs' injuries and damages.

## PRAYER FOR RELIEF

575. Plaintiffs Josh Jameson and Tawney Jameson, individually and on behalf of L.J., all minors, respectfully request judgment in their favor and against each **DEFENDANTS** to the full extent of the law, as follows:

    a.    For an award of compensatory damages for L.J. in an amount to be determined at trial on the following elements of damage:

        i.    The nature, extent, duration, and permanency of L.J.'s injuries;

        ii.    The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

        iii.    The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

        iv.    The pain, suffering, and mental anguish experienced in the past;

        v.    The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

        vi.    The present value of any loss of ability to earn in the future;

        vii.    Any scars, disfigurement, and visible results of L.J.'s injuries;

viii.   The reasonable expense of any necessary help in L.J.'s home which has been required as a result of L.J.'s injuries;

ix.   The present value of any necessary help in L.J.'s home reasonably certain to be required in the future;

x.   L.J.'s inability to attend school;

xi.   Actual financial loss; and

xii.   Any other actual pecuniary loss or future financial loss proximately caused by **DEFENDANTS**.

b.   For an award of compensatory damages for Josh Jameson and Tawney Jameson, in an amount to be determined at trial, to fairly compensate Josh Jameson and Tawney Jameson for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services of his children resulting from the injuries to L.J. proximately caused by **DEFENDANTS**' tortious acts and misconduct described herein;

c.   For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.   For an award of punitive damages in an amount to be proven at trial;

e.   For an award of costs and attorneys' fees, as allowable by law;

f.   For pre-judgment and post-judgment interest, as allowable by law; and

g.   For such other and further relief as this Court may deem just and proper.

### JURY DEMAND

576.   Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 26th day of August, 2024.

**BULLOCK LEGAL GROUP LLC**


*/s/ Breean Walas*
Breean "BW" Walas (PHV – AR2006077)
Tina M. Bullock (PHV – MS6763L75M)
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
(770) 758-9423 (direct)
(833) 296-5291 (office)
(833) 895-2022 (facsimile)
   bwalas@bullocklegalgroup.com
   tina@bullocklegalgroup.com


**NIGH GOLDENBERG RASO & VAUGHN, PLLC**

Ashleigh Raso (MN0393353)
60 S. 6th Street, Suite 2800
Minneapolis, Minnesota  55402
(612) 656-8002
(202)-792-7927 (facsimile)
araso@nighgoldenberg.com


*Attorneys for Plaintiffs Josh Jameson and Tawney Jameson, individually and on behalf of L.J., a minor*

## CERTIFICATE OF SERVICE

I, Breean "BW" Walas, certify that on August 26, 2024, I electronically filed the foregoing *Amended  and Supplemental Complaint and Demand for Jury Trial*  with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record for Defendants Roblox Corporation and Apple, Inc. All other defendants have been served via electronic mail sent to their counsel as follows:

Gary Rubman                          David Sneed
Covington & Burling LLP              Covington & Burling LLP
grubman@cov.com                      dsneed@cov.com

Ambika Kumar                         Adam S. Sieff
Davis Wright Tremaine                Davis Wright Tremaine
ambikakumar@dwt.com                  adamsieff@dwt.com

*Counsel for Defendants Microsoft Corporation and Mojang AB*


_/s/  Breean Walas_____
Breean "BW" Walas (PHV – AR2006077)